**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Ralph LOCKYER, Defendant-Appellee.**

**No. 71–1083.**

United States Court of Appeals,
Tenth Circuit.

Sept. 16, 1971.

Johnnie M. Walters, Asst. Atty. Gen. (Meyer Rothwacks, John P. Burke and John M. Brant, Attys., Tax Division, Dept. of Justice, and C. Nelson Day, U. S. Atty., of counsel, on the brief), for appellant.

E. L. Schoenhals, Salt Lake City, Utah, for appellee.

Before SETH and DOYLE, Circuit Judges, and KERR, District Judge.

WILLIAM E. DOYLE, Circuit Judge.

This is an income tax fraud prosecution in which the government seeks a reversal of a judgment of the district court which suppressed all of the evidence and dismissed a four-count complaint. The essential basis was that the Internal Revenue agent had conducted a criminal rather than a civil investigation prior to his referring the case to the special agent, Intelligence Division, and had done so without warning the defendant-appellee as to his rights and had thus violated the internal administrative regulation of the Revenue Service contained in one of its manuals; and had also violated the rights of the accused under the Fourth and Fifth Amendments of the Constitution of the United States.

On March 28, 1968, a four-count complaint was filed in the district court charging that the defendant had willfully attempted to evade and defeat a large part of the federal income tax owed by him for the calendar years 1961, 1962, 1963 and 1964, by means of filing false and fraudulent income tax returns contrary to § 7201 of the Internal Revenue Code of 1954. A combined motion was filed on behalf of the defendant seeking suppression of the evidence obtained from him and dismissal of the charges. The motion charged the Internal Revenue Service with dissemination of massive prejudicial publicity making a fair trial impossible, and further stated that the Internal Revenue Service had violated the defendant's Fourth and Fifth Amendment rights by obtaining his papers without informing him that he was under investigation for income tax fraud. The motion sought dismissal of the complaint and the suppression of all of the evidence obtained by the Internal Revenue Service. Hearings were held on the motions on June 10, 1968, and July 23, 1968. Subsequently, on December 19, 1969, there was a waiver of indictment followed by the filing of a four-count information which was substantially identical to the complaint which was on file. It was not until May 18, 1970 that arguments were heard on the motion to dismiss and the motion to suppress and, finally, on December 7, 1970, the trial court granted the defendant's motions. It is the judgment suppressing the evidence and dismissing the complaint which is before us for review.

The defendant-appellee taxpayer had been a used furniture dealer for 32 years until the date that he sold his business in June 1964. He was shown to have had a high school education and, to put it mildly, was not a bookkeeper and had not kept any formal records. The investigation started on December 6, 1965, when he was contacted by Internal Revenue Agent Vatsis concerning his 1964 income tax return. Vatsis called again the next day at which time he obtained the taxpayer's bank statements for the year 1964. On December 17 Vatsis made a third call and obtained further information and documents for the year 1963. The next contact was in February 1966, at which time still further material was obtained, including cancelled checks and bank statements for the year 1962. It was not until April 8, 1966 that the matter was referred to the Intelligence Division. Vatsis met with defendant on April 22, 1966, and was present while Special Agent Rich questioned him at length. Rich first gave him what purported to be a *Miranda* warning advising him that he was not required to make a statement; that he was entitled to have a lawyer present if he wished. However, there was no mention as to the function of Rich as a Special Agent for the Intelligence Division, and there was little or no inkling communicated that there had been a shift of emphasis from civil to criminal investigation. Special Agent Rich interviewed the defendant at great length and this interview was taped and transcribed. Rich also demanded further records from the accused for 1961, a tax year which had not been investigated by Agent Vatsis. After these records had been picked up by Vatsis, on Rich's instruction the defendant obtained a

lawyer and further communications were through him.

In ordering all of the evidence to be suppressed, the trial court applied a provision of the Internal Revenue Audit Technique Handbook which outlines the "procedure after discovering indications of fraud." The court held that this provision was fully applicable and could be invoked by the defendant. The indications of fraud were present, according to the court, at the very outset when an understatement of approximately $1,700.00 was apparent and it became evident that some of the records had been destroyed. The evidence obtained on December 8, 1965 and subsequent interviews were all tainted, and the revenue agent "built cases for the years 1964, 1963 and 1962 against defendant under the guise of conducting an audit for civil tax purposes." The court relied on the decision of the Supreme Court in United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), which held that a regulation vesting the Board of Immigration Appeals with discretion equal to that of the Attorney General in hearing and disposing of a case was intended to give to the Board full authority to hear and determine—an authority which could not be short circuited by the Attorney General,[1] and also on United States v. Heffner, 420 F.2d 809 (4th Cir. 1969) and United States v. Leahey, 434 F.2d 7 (1st Cir. 1970).

Some understatement of income was undoubtedly evident soon after the first interview. However, the condition was by no means clear at this stage. Revenue Agent Vatsis was then examining a capital transaction resulting from the sale of the business and was required to see other years. Moreover, the records were, as previously noted, inadequate thus requiring Vatsis to obtain the checks and bank statements, to segregate them and to obtain explanations from the defendant. Later sales records in the form of daybook entries were produced by defendant and these also had to be examined. The revenue agent was thus called upon to reconstruct the records for the three years in order to ascertain the true condition and this task was not completed until after the February 28, 1966 visit with the defendant after which the checks and statements for the year 1962 were obtained. The computations which resulted from this reconstruction showed a pattern of substantial understatements for the three-year period 1962–1964 inclusive. Following the completion of the mentioned computations, the agent determined that the total amount which the defendant had failed to report in the three years amounted to $55,000.00. The four-count complaint (which the court dismissed) described lesser amounts. These reductions were made by Intelligence Agent Rich following his investigation.

On this appeal the government argues:

First: The provision of the Audit Technique Manual was not designed to set a standard for the protection of the

1. Mr. Justice Clark in the majority opinion said:

Regulations with the force and effect of law supplement the bare bones of § 19(c). The regulations prescribe the procedure to be followed in processing an alien's application for suspension of deportation. * * *

The regulations just quoted pinpoint the decisive fact in this case: the Board was required, as it still is, to exercise its own judgment when considering appeals. The clear import of broad provisions for a final review by the Attorney General himself would be meaningless if the Board were not expected to render a decision in accord with its own collective belief. In unequivocal terms the regulations delegate to the Board discretionary authority as broad as the statute confers on the Attorney General; the scope of the Attorney General's discretion became the yardstick of the Board's. And if the word "discretion" means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority according to his own understanding and conscience. This applies with equal force to the Board and the Attorney General. In short, as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner. 347 U.S. at 265–266, 74 S.Ct. at 502–503.

taxpayer; that it was intended to guide employees of the Internal Revenue Service so as to improve efficiency in gaining the facts and at the same time not imperiling the case by conducting themselves so as to give the taxpayer legal arguments.

Second: That the evidence at the suppression hearing did not in any event establish a violation of the provisions of the manual and that the court's holding that there was a violation, together with the drastic action which the trial judge took, constituted plain error.

I

The provision (§ 10.09) of the Internal Revenue Service Audit Technique Handbook which was relied on by the trial court[2] states that the Internal Revenue Manual requires that a revenue agent suspend his investigation when he discovers what he believes to be an indication of fraud. The purpose is so that the Chief, Intelligence Division, can evaluate it. The agent is cautioned not to stop too soon lest he might not have information necessary for the Intelligence Division to make a decision. He is also told that he must have sufficient facts and explanations to demonstrate an understatement (of income), and that he is not to stop before having sufficient evidence to demonstrate intent. He is further cautioned against

1. Taking the investigation too far, whereby there may be duplication of effort by the special agent, or

2. Jeopardizing the criminal case by giving the taxpayer a basis for claiming that the criminal case was prepared by the revenue agent under the guise of conducting a civil audit.

The controlling guideline is discovery of a substantial understatement coupled with "an indication that the understatement was deliberate."

From start to finish the regulation seeks to guide the revenue agent in the execution of his investigation. Its manifest purpose is to delineate and delimit the duties of the revenue agent prior to referral to the Intelligence Division. Does an unpublished regulation

2. This directive provides in pertinent part:
The Internal Revenue Manual requires that a revenue agent immediately suspend his investigation, without disclosing to the taxpayer or his representative the reason for his action, when he discovers what he believes to be an indication of fraud. He should report his findings in writing to the Chief, Audit Division, through his group supervisor. See section 10.091. The purpose of the referral is to enable the Intelligence Division to evaluate the criminal potential of the case and decide whether or not a joint investigation should be undertaken. It is important, therefore, that the agent's referral report contain detailed information to enable the Chief, Intelligence Division, to make a proper evaluation.
When an agent has been alerted to the possibility of fraud, he must know at what point he should suspend his examination and prepare his referral report. If he stops too soon he may not have developed all the information necessary for the Chief, Intelligence Division, to base his decision. He may not be able to demonstrate that there is an actual understatement resulting from his find-

ings if he has not gathered sufficient facts or sought explanations' which might account for the discrepancy. Or he may not have found sufficient evidence relating to intent. If he continues his examination too far he may create possible duplication of effort, as the special agent may find it necessary to repeat some of the work done by the revenue agent in order to document the evidence required in a criminal case. He may give the taxpayer a basis for claiming that the criminal case was substantially built by the revenue agent under the guise of conducting an audit for civil tax purposes. Due to inexperience he may take actions which can jeopardize the criminal case.
Certain guidelines can be laid down to aid the agent in deciding how far to proceed in his examination where the possibility of fraud exists. The first of these would be to define what is meant by an "indication of fraud." A revenue agent can be satisfied that he has discovered an indication of fraud when he has determined that there has been a substantial understatement of income and that there is an indication that the understatement was deliberate.

having this character and tenor apply to and define the rights of the taxpayer? We conclude that it does not.

The case of Accardi v. Shaughnessy, *supra,* does not call for any such construction, for there the regulation which was held to have the force of law was a vital procedural provision which governed the procedure to be followed in deportation cases. The procedural due process deprivation was there clear.

Not even the decision of the Fourth Circuit in Heffner, *supra,* which is expansive and sweeping in its language, is authority for applying a regulation like the present one. There the instruction was a public one which was issued to intelligence agents and which was proclaimed in the press release given at the time of publication as having for its purpose the protection of the constitutional rights of "persons suspected of criminal tax fraud, during all phases of its investigation."

Similarly, the decision of the First Circuit in Leahey, *supra,* had to do with the same publicly announced directive and the court regarded the *public* announcement of this agency wide policy, applicable to criminal investigations, to be significant as showing that formal procedures for the protection of the citizenry were being promulgated. At the same time, the court noted that failure of an agency to adhere to its procedures does not always result in deprivation of due process. On this the court said:

We do not say that agencies always violate due process when they fail to adhere to their procedures. It is important here that the procedure set forth in the news release was an agency wide directive designed to protect taxpayers by setting a clear and uniform standard governing the first contact between a Special Agent and a tax fraud suspect. Our result would have been different if the I.R.S. had violated a procedure designed to promote some other agency goal. Thus, if I.R.S. procedures stated that only trained Special Agents were to interview suspects, an interrogation which

complied with all other procedures but was conducted by an accountant, would not seem to us to conflict with due process. Such a deviation from I.R.S. procedures would not deprive the person interviewed of protection that was afforded to other taxpayers; his interview would not differ significantly from others except that his questioner would be less adept. Only the efficiency of I.R.S. operations would be harmed. * * * 434 F.2d 11.

The directive under consideration is a far cry from that present in *Accardi* and also from the directive considered in *Heffner* and *Leahey.* The entire design and thrust of the instant directive is that of internal administration. It is not a published provision and it does not purport to exist for the protection of the taxpayer's interests and rights; its manifest purpose is avoidance of encroachment and duplication and prevention of mistakes by the agent which could result in complicating prosecutions. Therefore, we must hold that the directive was not and is not available to the taxpayer here as a definition of his rights and that the action of the court in so construing it was erroneous.

II

We must, however, also disagree with the trial court's conclusion that the revenue agent violated the regulation. True, the directive requires the agent to suspend his investigation "when he discovers what he believes to be an indication of fraud." If the word "indication" is construed to mean a sign or symptom of fraud, which is a well accepted meaning of the word, and if the remainder of the directive is disregarded, the revenue agent would have to cease almost before he started his investigation. Used in this sense it is arguable that a slight suggestion unverified would be a sufficient indication. In our view broader meaning was intended. The detailed instructions given require the agent to continue his investigation so as to verify a substantial understatement of income and so as to obtain explana-

tions from the taxpayer in order to discover evidence whether the understatement was deliberate. Therefore, a fair reading of the entire provision convinces us that the civil investigation was intended, consistent with the directive, to continue for sufficient time and in enough depth so as to provide the Chief, Intelligence Division, with enough information to reach his decision. Agent Vatsis did not exceed the bounds of the directive, at least through his computations and reconstructions for the tax years 1962, 1963 and 1964, which computations followed the interview February 28, 1966.

## III

■ Nor does it appear that the constitutional rights of the defendant were violated during the civil investigation by Revenue Agent Vatsis.[3]

The better reasoned cases hold that a warning in accordance with Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, must be given to the taxpayer by either the revenue agent or the special intelligence agent at the inception of the first contact with the taxpayer following transfer of the case to the Intelligence Division. See United States v. Dicker-son, 413 F.2d 1111 (7th Cir. 1969); United States v. Turzynski, 268 F.Supp. 847 (N.D.Ill.1967) (Judge Will); and United States v. Wainwright, 284 F. Supp. 129 (D.Colo.1968) (Chief Judge Arraj). The cited cases have not required that a warning be given prior to the transfer to Intelligence, and in our case such a warning was not called for until after the February 28, 1966 meeting between Agent Vatsis and defendant and the completion by Vatsis of his computations showing a pattern of understatement of income which, in turn, gave rise to an inference of deliberateness on the defendant's part. Therefore, the evidence obtained through this stage of the proceedings was not subject to suppression.

The district court was not called on to decide whether there was a waiver of constitutional rights following the warning which was given to the defendant by Special Agent Rich on April 22, 1966, and so the question remains as to whether there was the kind of positive and knowledgeable waiver which is required by Miranda.[4] We do not express an opinion as to this, but simply point out that it is a question of fact for the court to consider at the trial.

The judgment is reversed and the cause is remanded for further proceedings.

3. The trial court's decision is based entirely on the Accardi doctrine and we mention this fact because of the likelihood of further proceedings.

4. See Miranda v. Arizona, 384 U.S. at 475, 86 S.Ct. at 1628, wherein the Court said:

   If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. [State of] Illinois, 378 U.S. 478, 490, n. 14 [84 S.Ct. 1758, 1764, 12 L.Ed.2d 977]. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461] (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.