UNITED STATES of America

v.

Andrew TOUSSAINT.

Crim. No. H–78–86.

United States District Court,
S. D. Texas,
Houston Division.

Sept. 14, 1978.

James L. Powers, Asst. U.S. Atty., Houston, Tex., for United States.

Dougal C. Pope, Houston, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER RELATING TO SUPPRESSION MOTION

COWAN, District Judge.

During the year 1974 Andrew Toussaint, the defendant herein, was an employee of the Internal Revenue Service. He was apparently employed as a Revenue Agent. Toussaint had become sufficiently skilled in his work to teach courses in Internal Revenue procedures. Toussaint earned about $20,000 per year as an employee of the IRS. Before employment with the IRS, Toussaint had been a used car dealer.

In 1975 Toussaint filed an income tax return claiming a $190,000 theft loss. He claimed that he had been the victim of a $190,000 loss because of the theft of a $190,000 Picasso painting from his home.

The Internal Revenue Service commenced an investigation of Toussaint's 1974 return. Because of the fact that Toussaint was an Internal Revenue Agent, working in Houston, the case was assigned to the Beaumont office of the IRS where it was handled by a Mr. DeFee whose supervisor was a Mr. Bevans. DeFee is a "Revenue Agent" as distinguished from a "Special Agent."

On February 5, 1976, DeFee called on Toussaint for the purpose of discussing with him Toussaint's continued work as a used car salesman and also for the purpose of discussing the $190,000 claimed theft loss.

At the time Agent DeFee interviewed defendant Toussaint on February 5, 1976, the activities of "Revenue Agents" and "Special Agents" were governed by rules promulgated in a booklet entitled "Audit Technique Handbook for Internal Revenue Agents." Section (10)91 in its pertinent portions provides as follows:

(1) IRM 4567.3 provides that if, during the course of an examination, a revenue agent discovers indications of fraud, he shall suspend his activities at the earliest opportunity without disclosing to the taxpayer, his representative or employees, the reason for such suspension. He will then prepare a report of his findings in writing as explained in (10)92. The purpose of the referral report is to enable the Intelligence Division to evaluate the criminal potential of the case and decide whether a joint investigation should be initiated. It is important, therefore, that the referral report contain sufficient information to enable the Chief, Intelligence Division, to make a proper evaluation.

(2) After an agent discovers the possible existence of fraud, he must decide when to suspend his examination and prepare his referral report. As stated above, "at the earliest opportunity" does not mean immediately. It means at the earliest point after discovering *firm* indications of fraud. This means more than suspicion. It means the agent has taken steps to perfect the indications of fraud and developed them to the degree necessary to form the basis for a sound referral. This must be done at the first instance while the books and records are available to the agent, because, later on, they may not be accessible and information contained therein may be impossible to obtain.

■ Revenue Agent DeFee was not, of course, required to give a *Miranda* type warning to Toussaint. See *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); but this is not the issue. The issue is: What is the consequence of IRS' intentional violation of the rules promulgated in its published Audit Techniques Handbook?

*United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970) is also persuasive. That case involved a situation in which the IRS agents failed to follow its own published, general procedure requiring Special Agents to give certain warnings upon initial contacts with taxpayers. The First Circuit wisely said:

> . . . The crucial question is whether we must exclude this evidence so that agencies will be compelled to adhere to the standards of behavior that they have formally and purposely adopted in the light of the requirements of the Constitution, even though these standards may go somewhat further than the Constitution requires.

Defendant's Exhibit No. 2, and the testimony of witness DeFee reveal that DeFee was given the following critical information at the conference of February 5, 1976. DeFee was told by Toussaint that he had received the Picasso from his grandfather as a gift. Grandfather Toussaint, however, was not a wealthy man and had no estate at the time of his death. No gift tax return was filed. No gift tax was paid. Toussaint did not know where his grandfather had obtained the painting except that it may have been stolen. Toussaint had no verification that the Picasso was a Picasso except that it purported to be signed by Picasso. The painting had never been examined by an art expert to determine its authenticity. The painting had never been appraised. The painting had never been insured because Toussaint reported that "every time you show someone that you have something valuable in your home, they will either steal it or beat you out of it."

Mr. DeFee did not, immediately after February 5, 1976, refer this case to the Intelligence Division for handling by a "Special Agent." Instead, he continued to work on the case intensively for another six months.

Mr. DeFee again interviewed defendant Toussaint on April 7 and 15, 1976, May 20 and 27, 1976, and June 7, 1976. In addition, he conducted a detailed investigation including interviews with experts on the evaluation of art objects, interviews with investigating police officers, and ultimately an interview with the taxpayer's presumably elderly mother in Lake Charles, Louisiana. The taxpayer was given no notice of the potential interview with his mother.

Finally, in mid-June after an interview with the taxpayer's mother, a determination was made that the matter would be handled criminally, and the referral to the "Special Agents" of the Intelligence Division was made.

### Critical Factual Determination

■ Defendant moves to suppress all evidence acquired in communications and interviews with the taxpayer after the interview of February 5, 1976. The taxpayer's theory is that on February 5, 1976, the Revenue Agent did in fact make discovery of firm indications of fraud, and that under the procedures established by Rule (10)91 of the Audit Technique Handbook for Internal Revenue Agents, the referral should have been made at the earliest opportunity. The taxpayer also contends that the continued investigation by the Revenue Agent after February 5, 1976, was a pretense for the purpose of using the Revenue Agent to obtain evidence which agents, or their supervisors, realized would ultimately be used in connection with a criminal investigation.

The undersigned has definitely determined, and finds, that after the interview of February 5, 1976, the Revenue Agent had, without any question, discovered firm (in fact almost conclusive) indications of fraud. In the language of the handbook, the explanations offered by the taxpayer concerning the alleged Picasso were clearly ". . . inadequate or unreasonable."

No sensible person would believe that there was any real likelihood, in view of the admissions made by Toussaint concerning the financial status of the grandfather, and concerning his own failure to have this supposedly valuable painting appraised and insured, that Toussaint actually owned a $190,000 Picasso. In addition, it is clear that Toussaint, an experienced Revenue Agent, would have known that he was allowed to deduct only an amount equivalent to his grandfather's basis in this painting.

While reluctant to conclude that any agency, branch or representative of the United States government has been less than candid, the undersigned simply cannot credit testimony or any argument that the agent, from the interview of February 5, 1976, did not possess ". . . firm indications of fraud."

*Legal Consequences of Failure to Follow Prescribed Procedures*

The United States argues that no legal consequences flow from the agents' violation of their own Audit Technique Handbook. The principal case cited in support of the government's position is *United States v. Lockyer*, 448 F.2d 417 (10th Cir. 1971).

The undersigned will not apply *Lockyer* here for two reasons:

1. The case at bar is clearly factually distinguishable from *Lockyer*;
2. Much of the reasoning of the Tenth Circuit seems to ignore the *Accardi* doctrine [*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954)] and its progeny, and to rest upon a complete misconception of the practical representations which the Internal Revenue Service makes to the public by its policies of handling civil investigations through "Revenue Agents," and criminal investigations through "Special Agents."

As to the factual distinctions, it is not totally clear in *Lockyer* that the agents had discovered "firm indications of fraud." *Lockyer*, arguably, involved a situation in which the taxpayer had been a very poor bookkeeper, keeping totally inadequate records of a used furniture business. This situation simply cannot compare to that here, where a person of modest income claims a $190,000 loss on an unappraised, unverified "Picasso" which he supposedly received from an impecunious grandfather, and where the taxpayer himself is a sophisticated expert on the tax laws and practices of our nation.

The Tenth Circuit's opinion is predicated upon what the undersigned believes is an erroneous concept of the IRS regulation here in issue. The Tenth Circuit said:

First: The provision of the Audit Technique manual was not designed to set a standard for the protection of the taxpayer; . . . it was intended to guide employees of the Internal Revenue Service so as to improve efficiency in gaining the facts and at the same time not imperiling the case by conducting themselves so as to give the taxpayer legal arguments.

The Tenth Circuit's concept of the purpose of this regulation is inconsistent both with the language of the Audit Technique Handbook and with common knowledge concerning Internal Revenue Service procedures.

The language of the Audit Technique Handbook itself recognizes that "a Revenue Agent," known by the public to be investigating merely civil controversies, can obtain freer access to records, and can obtain information more readily than a "Special Agent." The handbook says, in this connection:

. . . This (i. e., the taking of steps necessary to perfect the indications of fraud and to develop them to the degree necessary to form the basis for a sound referral) must be done at the first instance while the books and records are available to the agent, because, later on, they may not be accessible and information contained therein may be impossible to obtain.

In addition, it is common knowledge that the overwhelming preponderance of tax audits are relatively routine matters, in

which full, complete and candid cooperation between the auditing revenue agent and the taxpayer or his representatives (either legal or accounting) is highly desirable. A free, open, trusting audit can normally be accomplished only in those situations where the taxpayer feels reasonably secure that the audit is a relatively routine one and that only civil penalties are involved. Few well-advised taxpayers would cooperate with an investigation openly, fully and voluntarily if the taxpayer or his legal or accounting representatives knew that the government had made a decision to prosecute him for tax evasion criminally.

■ A taxpayer whose records are being audited by a "Revenue Agent" can, under accepted procedures, feel reasonably secure (assuming that he has played straight with the government) that he is not the subject of a criminal investigation and that free cooperation, exchange of information, the give-and-take of negotiating points which are susceptible of good faith differences, will not subject him to criminal prosecution. The government, by virtue of the manner in which it has made a distinction between "Revenue Agents" and "Special Agents" for very practical and commendable purposes, has, it seems to this Court, virtually made a contract with the public that it will comply with its own rules. The *Accardi* doctrine requires it to do so. See: *United States v. Nixon*, 418 U.S. 683, 90 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Mayor and City Council of Baltimore v. Mathews*, 562 F.2d 914 (4th Cir. 1977); *Electronic Components Corp. of N. C. v. NLRB*, 546 F.2d 1088 (4th Cir. 1976). See particularly *United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969) where a conviction for tax fraud was reversed because IRS agents did not follow IRS regulations in the course of their investigation.

■ This Court believes that the case at bar is controlled by *United States v. Prudden*, 424 F.2d 1021 (5th Cir. 1970). Among other things, *Prudden* teaches that the Fourth Amendment is violated if a taxpayer's cooperation is obtained through fraud or deceit. Responsive to this rule, the Au-

dit Technique Handbook for Internal Revenue Agents, states in part:

. . . the over-extension of the examination (i. e., by a Revenue Agent before referral to a Special Agent) may jeopardize criminal prosecution by giving the taxpayer a basis for claiming that the criminal case was substantially built by the Revenue Agent under the guise of making an audit for civil tax purposes.

A cursory review of the literature in this area reveals that tax practitioners are vividly aware of the difference between "Revenue Agents" who conduct civil investigations and "Special Agents" who conduct criminal investigations. The rules of the game are totally different, depending upon the nature of the investigation and the nature of the investigator.

A typical statement from Barnett, "Procedures in Tax Fraud Investigations," 47 Taxes 807, at 812, is:

Revenue Agents are under instructions to suspend their examinations and refer the matter through channels to the Intelligence Division whenever facts come to their attention indicating fraud. Despite such admonition, the Agent may continue his examination after he becomes aware of fraud, so that his referral to the Intelligence Division will have substantial support. It is not unknown for Revenue Agents to continue their examination after awareness of fraud in order to obtain as much evidence as possible before the Special Agent gets into the case, on the well-founded assumption that the taxpayer thereafter will be less willing to cooperate.

On being faced with such extensive inquiries, the taxpayer's representative has a weighty decision to make. He can decline to cooperate. Such declination, however phrased, constitutes a reliance upon the taxpayer's constitutional right against self-incrimination. If he concludes that the examination is non-criminal from its inception, and his knowledge of the taxpayer's affairs satisfies him that no fraud can be developed, he may safely cooperate. If he is in doubt, as to

either the reason for the inquiries or what they may develop, he should treat the examination as a criminal investigation.

A primary rule is: "When in doubt, do not cooperate." Barnett, "Procedures in Tax Fraud Investigations," 47 Taxes 807, at 814 (Dec. 1969). See also Bacon, "IRS and the Criminal Lawyer," 7 Trial, March/April 1971, pp. 33–34; Ross, "What Every Lawyer Should Know about Tax Evasion and Fraud Cases," 54 ABA J. 1102 (Nov. 1968); Freeman and Freeman, *The Tax Practice Handbook*, 1973, § 10–5.

In the case at bar, the Court has determined that as of February 5, 1976, the Revenue Agent had, at least, a "firm indication of fraud." Thereafter, the Revenue Agent continued the investigation for a considerable period of time without advising the taxpayer that information was being collected which could be used for a criminal prosecution. If a reference had been made on February 6, 1975 and thereafter the "Special Agent" had immediately entered the case, it is highly unlikely that this sophisticated, experienced taxpayer would have continued the voluntary cooperation which he had afforded the Revenue Agent. Persons are held to intend the natural and probable consequences of their actions. The natural and probable consequences of the Revenue Agent not making the referral on February 6, and continuing the investigation by himself was to deceive Toussaint into believing that the investigation was routine and that criminal charges were not contemplated. Accordingly, interrogations of Toussaint after February 5, 1976, violated his Fourth Amendment rights, as well as Fourteenth Amendment rights under the *Accardi* doctrine.

*United States v. Dawson*, 486 F.2d 1326 (5th Cir. 1973) is distinguishable from the case at bar because in that case there was substantial compliance with IRS policies as promulgated in IRS news-releases Nos. 897 and 949. In the case at bar there was no such substantial compliance with the important procedures mandated by § (10)91 of the Audit Technique Handbook for Internal Revenue Agents.

*United States v. Bland*, 458 F.2d 1 (5th Cir. 1972) is not controlling for two reasons. First, the *Bland* case was decided before the promulgation of Rule (10)91 of the Audit Technique Handbook for Internal Revenue Agents; and second, it affirmatively appeared from the record in *Bland* that the taxpayer had not in any way been misled. In the case at bar Toussaint obviously knew the difference between the Revenue Agent and a Special Agent, and this Court may properly infer and does infer Toussaint's cooperation and voluntary statements would have ceased as soon as he determined that his case was being investigated by a Special Agent.

This case, in the Court's judgment, is controlled by *Accardi* and its progeny (see collection of cases at page 7 above), by *United States v. Heffner, supra,* and by the decision of the United States District Court for the Southern District of Texas in *United States of America v. Brod*, 324 F.Supp. 800 (S.D.Tex.1971), 28 AFTR.2d 715340.

In *United States v. Heffner, supra,* the taxpayer was told by the Special Agent that he was not required to furnish any information which might tend to incriminate him and that anything which he said could be used against him. The taxpayer was not warned that the function of Special Agents of the Intelligence Division was to investigate the possibility of criminal prosecution for tax fraud. The instructions to Special Agents of the Intelligence Division required Special Agents to produce their credentials and to make a statement concerning their function to investigate the possibility of criminal tax fraud. Applying the *Accardi* doctrine to the facts, the Court in *Heffner* said:

> An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its actions cannot stand and courts will strike it down . .

The United States District Court for the Southern District of Texas held in *United States v. Brod, supra,* that evidence obtain-

ed in violation of the procedures of the Internal Revenue Service should be suppressed.

*Remedy*

The exclusionary rule has in recent years been subjected to considerable criticism. See *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and the cases cited therein at footnote 5. In this case, however, exclusion of statements made by taxpayer Toussaint and interviews subsequent to February 5, 1976, is the only sanction which either this Court or the taxpayer has available. It would be an empty gesture to simply tell the Revenue Agent not to repeat his conduct or to make meaningless admonitions to the Internal Revenue Service. The only effective method in this situation to apply the *Accardi* doctrine to the regulations in question is to suppress evidence of admissions or statements made by Toussaint in interviews after February 5, 1976.

It is an open question as to whether or not the testimony of the taxpayer's mother should be excluded. The Court's tentative view is that the testimony of the taxpayer's mother, if offered by the government, should not be excluded; however, at time of trial, the Court will, out of the presence of the jury, before admitting the testimony of the taxpayer's mother, conduct a hearing for the purpose of allowing the taxpayer to present such argument and evidence as he wishes to present concerning the admissibility of the taxpayer's mother's testimony, if offered.

It is therefore ORDERED that all evidence of statements made by Toussaint in interviews with the Internal Revenue Agents after February 5, 1976 will be suppressed.