**UNITED STATES of America,**

v.

**Jacob D. MATIS, Defendant.**

**No. 79 Cr. 443.**

United States District Court,
S. D. New York.

Sept. 7, 1979.

Robert B. Fiske, Jr., U. S. Atty., New York City, for the Southern District of New York by Robert N. Schwartz, Asst. U. S. Atty., for the Government.

Kostelanetz & Ritholz, by Robert S. Fink, New York City, for defendant.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Motions by the defendant, for dismissal of the indictment or various counts thereof, are denied. Fed.R.Crim.P. 12(b)(1), (2).

Motion by defendant, to suppress evidence on the ground that it was unlawfully seized from his possession, is denied. Fed. R.Crim.P. 12(b)(3).

The Court conducted an omnibus hearing on pre-trial motions in this case on July 13, 1979, and received the post-hearing submissions of the defendant on August 3, and of the Government on August 14. The following are the Court's findings of fact and conclusions of law. Fed.R.Crim.P. 12(e).

### FACTS

The defendant, Dr. Jacob Matis, and his wife Rosalie filed their joint return for 1972 federal income tax on June 13, 1973, and their joint return for 1973 on June 11, 1974, in each case having received a sixty-day extension for filing. To compute their taxable income, their accountant, Theodore Kass, had assembled their bank accounts, compared them with various other records, and then culled from them any transactions representing nontaxable transfers or sources of income. The transactions that could not be so identified he reported as taxable income.

The Internal Revenue Service ["IRS"], through a routine computer screening process known as "Discriminant Function Audit Selection," selected the Matises' 1972 return for auditing, and Revenue Agent James Quaglietta was assigned to the audit. According to testimony developed at the pretrial hearing, the IRS assigns "Revenue Agents" to investigations that are civil in nature; to investigations of possible criminal wrongdoing, it assigns "Special Agents." It is, of course, possible for a civil audit begun by a Revenue Agent to be transferred to a Special Agent for criminal investigation.

Eventually, the Matises' 1973 return was included in the audit as well. On June 27, 1974, Quaglietta canvassed local banks to determine whether their records indicated any accounts belonging to Jacob or Rosalie Matis. Presumably, several responded, but most notably, on July 15, 1974, the Chase Manhattan Bank reported that it listed a checking account under both those names [hereinafter, this account will be referred to as the "Chase checking account"].

By June 1974, Kass learned that the IRS had begun an audit of the Matises' returns. He subsequently met with Quaglietta on three or four occasions, at which times he explained his method of computing the Matises' taxable income, and produced various documents, including bank records, the Matises' savings account passbooks, and Dr. Matis' "cash book," a purported record of all the receipts of Dr. Matis' practice.

Kass produced no documents pertaining to the Chase checking account, and at some point Quaglietta informed him of its existence. Precisely when this occurred is not at all clear, but the parties seem to agree that it happened between the beginning of November 1974 and the end of April 1975.[1] Upon learning of the account, Kass told Quaglietta that he had not known of it before. Thereafter, he informed Dr. Matis that he wished to cease representing him, and advised him to retain a lawyer to con-

---

1. Kass was particularly unclear about dates, as the following excerpt from his testimony shows:

Q When did you commence representing Dr. Matis for the purposes of this audit?
A I would guess about the first of 1975

. . . .

Q How accurate is your estimate of the beginning date?
A I am working backwards from April, and my recollection is that I represented Dr. Matis in this particular matter for about four or five months.
Q Could it be March '74 that you first met Agent Quaglietta?

A It is possible. I'm not at all sure.

. . . . .

Q During the time when you represented Dr. Matis for this civil audit, were you advised by Revenue Agent Quaglietta that he had learned of a Chase Manhattan checking account?
A Yes.
Q When was that?
A I would imagine that was April of 1975.
Q Is that your testimony?
A I don't remember exactly. Once again, I am relating it to certain facts.
Transcript of Proceedings 46–47, 51 (July 13, 1979) [hereinafter referred to as "Tr."].

duct any further discussions with the IRS regarding the audit.

On April 30, 1975, William Slivka, an attorney specializing in taxation and estate matters, began to represent Matis. When he first met with Quaglietta on May 22, 1975, Slivka inquired as to the nature of the investigation, whereupon Quaglietta told him that it was "a routine audit," which he had been assigned in the ordinary course of his duties as a Revenue Agent. Slivka asked why Quaglietta had canvassed local banks, to which Quaglietta responded that although it was not routine, he did so in this case for two reasons: *first,* because he had learned that the Matises' 1970 and 1971 returns had been audited, and that the audits had resulted in additions to income; and *second,* because of Matis' profession as a physician. Slivka also asked what would happen if the deposits into the Chase account were irreconcilable with the Matises' reported income. Quaglietta responded that a lot of additional tax would be assessed.

Towards the end of the May 22 meeting, or at the beginning of their next meeting on July 14, Slivka showed Quaglietta his analysis of the deposits into the Chase checking account during 1972 and 1973. He identified certain deposits as attributable to nontaxable income or transfers, and indicated that he had no explanation for others. Slivka also discussed some of the Matises' other accounts, and produced additional documents. Quaglietta told Slivka that he would treat the unexplained items as taxable income, and that besides the requisite additional tax, he would have to impose a five percent negligence penalty. Quaglietta further stated that he did not want to see Dr. Matis go to jail.

Quaglietta then prepared a consent form for the Matises to sign indicating the additional tax due plus a five percent negligence penalty. The form he used was a standard IRS Form 4549, entitled "Income Tax Audit Changes," which, at the bottom, just above the space for the taxpayer's signature, bears the following legend: "It is understood that this report is subject to

acceptance by the District Director." As completed by Quaglietta, the "4549" obligated the Matises to pay an additional $26,-286 tax plus a $1,314 penalty for 1972, and an additional $41,205 tax plus a $2,060 penalty for 1973. Slivka testified that he understood the "4549" to be subject to the District Director's review and possible veto.

On July 15, Slivka brought the "4549" to the Matises, and, after they had signed it, delivered it back to Quaglietta. The District Director's approval, however, was not forthcoming. Quaglietta's manager, who would have had to approve it before transmitting it to the District Director, refused, and instead recommended that Quaglietta refer the audit to the IRS Intelligence Section for possible criminal investigation. This was done, and in early September 1975, Slivka learned that a criminal investigation had, in fact, begun. On June 15, 1979, Dr. Jacob Matis was indicted.

The indictment contains four counts. Counts One and Two, which relate respectively to the returns filed for 1972 and 1973, charge that:

> On or about January 1, 1972, through on or about April 15, 1974, in the Southern District of New York, JACOB D. MATIS, the defendant, did unlawfully, wilfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar years 1972 and 1973 by filing and causing to be filed with the United States Internal Revenue Service false and fraudulent joint income tax returns wherein the defendant JACOB D. MATIS did not report certain income in the manner hereinafter described on his United States income tax returns for the calendar years 1972 and 1973.

> It was a part of the offenses charged herein and a means of their commission that the defendant JACOB D. MATIS, a practicing physician, would receive and then fail to report as taxable income on his United States income tax returns the proceeds of certain checks, drafts and orders issued by several insurance compa-

nies in payment of medical and consultative services rendered by the defendant in the following approximate amounts for the following calendar years:

| COUNT | YEAR | APPROXIMATE AMOUNT |
|-------|------|--------------------|
| ONE | 1972 | $44,197.20 |
| TWO | 1973 | $44,281.25 |

It was a further part of the offenses charged herein and a means of their commission that the defendant JACOB D. MATIS filed and caused to be filed with the United States Internal Revenue Service, on or about the approximate dates set forth below, false and fraudulent income tax returns on behalf of the defendant JACOB D. MATIS and his wife wherein he stated that he and his wife's taxable income for the said calendar year and the amount of tax due and owing thereon were as hereinafter set forth, whereas, as he then and there well knew, he and his wife's true and corrected taxable income and true and corrected income tax due and owing to the United States were substantially in excess of those reported in the said returns and in the approximate amounts hereinafter set forth:

| COUNT | DATE | TAXABLE INCOME AS SET FORTH IN THE RETURN | TRUE & CORRECTED TAXABLE INCOME |
|-------|------|--------------------------------------------|----------------------------------|
| ONE | June 13, 1973 | $89,464.00 | $133,661.12 |
| TWO | June 11, 1974 | $38,729.00 | $ 83,010.25 |

| | INCOME TAX AS SET FORTH IN THE RETURN | TRUE & CORRECTED INCOME TAX |
|------|----------------------------------------|------------------------------|
| ONE | $37,963.00 | $59,497.43 |
| TWO | $12,407.00 | $34,840.33 |

The specific statute cited as having been violated is 26 U.S.C. § 7201.[2] Counts Three and Four, which also relate to the returns filed for 1972 and 1973, respectively, charge Dr. Matis with making and subscribing returns containing false statements in violation of 26 U.S.C. § 7206(1).[3]

The defendant now moves for dismissal of the entire indictment, on the ground that it is barred by an agreement between the IRS and the defendant. Alternatively, the defendant seeks dismissal of Counts One and Two, arguing that they are "incomprehensible and, accordingly, fail to state a crime." As an additional defense to Counts One and Three, the defendant raises the statute of limitations. Finally, the defendant seeks an order suppressing for use as evidence documents he or his representatives turned over to the IRS while Quaglietta was conducting the audit, on the ground that they were unlawfully seized.

## DISCUSSION

### Agent's Conduct During the Audit

■ Defendant's contention that the Government is contractually or equitably barred from prosecuting him because of a consent agreement may be readily rejected. By its very terms, as well as according to the understanding of defendant's lawyer, the "4549" had no effect until the District Director approved it. Since that never happened, there was never any consent agreement.

■ Defendant's further contention, that the statements and conduct of Revenue Agent Quaglietta were in some way improper, may similarly be rejected. Defendant has failed to adduce one bit of evidence to support his assertion that Quaglietta was really engaged in a criminal investigation, and that his conduct and statements were designed to deceive the defendant into thinking that he was conducting only a civil audit. The Government has proven to the

---

2. Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony . . . .
26 U.S.C. § 7201.

3. Any person who—
(1) . . . Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . .
shall be guilty of a felony . . . .
26 U.S.C. § 7206(1).

satisfaction of the Court that Quaglietta had been assigned to conduct, and was at all times in fact conducting, a routine civil audit. Thus, the case upon which the defendant principally relies, *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1970), in which a revenue agent was found to have affirmatively misled the taxpayer as to the true nature of an audit, is inapplicable.

Defendant alternatively argues that even if Quaglietta had not been conducting a criminal investigation, he should have terminated his civil audit as soon as Kass admitted his ignorance about the Chase checking account, for at that point Quaglietta had sufficient "indications of fraud." In this regard, the defendant directs the Court's attention to section (10)91 of the *Internal Revenue Manual* (Vol. I–Audit), entitled "Procedure after Discovery Indications of Fraud—General":

> (1) . . . [I]f, during the course of an examination, a revenue agent discovers indications of fraud, he/she shall suspend his/her activities at the earliest opportunity without disclosing to the taxpayer, his/her representative or employees, the reason for such suspension. He/she will then prepare a report of his/her findings in writing as explained in (10)92. The purpose of the referral report is to enable the Intelligence Division to evaluate the criminal potential of the case and decide whether a joint investigation should be initiated. It is important, therefore, that the referral report contain sufficient information to enable the Chief, Intelligence Division, to make a proper evaluation.
>
> (2) After an agent discovers the possible existence of fraud he/she must decide when to suspend his/her examination and prepare his/her referral report. As stated above, 'at the earliest opportunity' does not mean immediately. It means at the earliest point after discovering firm indications of fraud. This means more than suspicion. It means the agent has taken steps to perfect the indications of fraud and developed them to the degree necessary to form the basis for a sound referral. This must be done at the first

instance while the books and records are available to the agent, because later on, they may not be accessible and information contained therein may be impossible to obtain.

> (3) On the other hand, if the agent extends his/her examination too far before submitting his/her referral report he/she may be doing unnecessary work. The special agent who will come into the case may find it necessary to repeat some of the work previously done in order to document evidence required in a criminal case. Also, the over-extension of the examination may jeopardize criminal prosecution by giving the taxpayer a basis for claiming that the criminal case was substantially built by the revenue agent under the guise of making an audit for civil tax purposes.

In addition, defendant cites *United States v. Toussaint*, 456 F.Supp. 1069 (S.D.Tex. 1978), in which the Court suppressed statements made by the taxpayer to a Revenue Agent at a point in time after the agent had a "firm indication of fraud." *Id.* at 1074–75.

In the first place, this Court finds that Quaglietta did not have firm indications of fraud until Slivka admitted that some of the deposits into the Chase checking account could not be attributed to nontaxable transfers or income. Only then was it clear that Dr. Matis had failed to report taxable income, for until then there was still the possibility that no taxable income had ever been deposited into that particular account. The defendant failed to identify any documents or information turned over by Slivka after that point; thus, even if the Court were to follow *Toussaint*, there would be nothing to suppress.

In the second place, the Court seriously questions the wisdom of depriving the Government of otherwise competent evidence because of a Revenue Agent's error in judgment. The determination of when the indications of fraud are sufficiently "firm" is a difficult enough question even for a court. Second-guessing a Revenue

Agent's judgment should not become a routine chore for judges, except when the error is so gross as to raise questions as to the agent's good faith. *See United States v. Tweel, supra. See also United States v. Mapp*, 561 F.2d 685 (7th Cir. 1977); *United States v. Lockyer*, 448 F.2d 417 (10th Cir. 1971).

In the third place, this Court considers it doubtful that section (10)91 gives the taxpayer any legal rights. *See United States v. Mapp, supra*, 561 F.2d at 690 ("these rules were adopted for the internal administration of the service and not for the protection of the taxpayer, and they therefore conferred no rights on the taxpayer") (citing *United States v. Lockyer, supra*, 448 F.2d at 420–21).

Finally, the Court finds defendant's implied suggestion, that in producing additional documents and information his representative "relied" on the Revenue Agent's continued involvement, somewhat disingenuous. What the representative "relied" on, or thought he had, was a "heads-I-win/tails-you-lose" position: he could turn over documents and then cry "Foul!" if criminal charges were later brought.

■ A more difficult question is posed by Quaglietta's statements to Slivka that he did not want to see the doctor go to jail and that if the deposits into the Chase checking account were irreconcilable with the Matises' reported income, "a lot" of additional tax would be assessed. Defendant asserts that Slivka was induced by them to believe that no criminal charges would be brought, and, in reliance on them, he disclosed additional information. Neither of the statements, however, justifies such reliance, for neither is incompatible with the subsequent criminal prosecution. Moreover, Slivka may be held to have known that a Revenue Agent's decision not to refer a case for criminal investigation can be overridden by his supervisor.[4]

*Statute of Limitations*

■ The applicable statute of limitations for the crimes charged in Counts One and Three is six years. 26 U.S.C. § 6531(2), (5). The Matises' 1972 return was received by the IRS Service Center on June 15, 1973, which is thus its date of filing, *see, e. g., United States v. Mahler*, 181 F.Supp. 900, 903 (S.D.N.Y.1960), and the date from which the statute of limitations began to run, *see, e. g., United States v. Habig*, 390 U.S. 222, 88 S.Ct. 926, 19 L.Ed.2d 1055 (1968). Since the indictment was filed in

---

4. In effect, Slivka admitted that he actually did know this:

Q Did you understand that Revenue agents do not have the authority to bind the IRS to a civil settlement?

A It is hard to respond to that question. Would you define what you mean by "bind"?

Q Isn't it accurate to state that in the normal instances when promises for changes, audit changes, are made on the consent of the taxpayer, that they are forwarded for review and approval by various supervisors and officers of the IRS, and that after that, normally administrative review takes place, if approval is given, the taxpayer of [*sic*] his representative would receive an acceptance letter or some notification of the fact that review has been completed and approved?

A I am in agreement with your statement of the ordinary procedure after an examination of this form is submitted, yes.

Q So is it fair to state that you realized when Revenue Agent Quaglietta received this form back from you on July 15th that he was going to have it examined or reviewed by his supervisors or superiors at the IRS to determine whether they agreed with it and were prepared to accept the changes which he recommended?

A No, it was not clear to me. May I tell you why?

Q Please.

A In many instances, where there are substantial changes, as there were here, Revenue agents will discuss with their group managers or reviewers, unofficially, the changes that they are making prior to preparing this report. So I don't know whether he had done that.

Q So you don't know whether he had or had not sought this unofficial review in advance?

A That's correct.

Q But you do know that it was subject to review, official review?

A Yes, sir.

Q And that that official review would only follow the submission with the consent of the taxpayer, is that correct?

A That is correct.

Tr. 129–30 (testimony of W. Slivka).

this case on June 15, 1979, it falls just within the statutory six years.

 The Court also finds that the defendant was "outside the United States" for at least twelve days between the filing of his 1972 return and the filing of the indictment. Consequently, the six-year statute was tolled for those twelve days. *See* 26 U.S.C. § 6531.

### Variance

The instant indictment presents a rare case of a variance in proof before the commencement of trial. Count Two of the Indictment charges that the defendant attempted to evade paying federal income tax on his 1973 income by filing a false return "[o]n or about January 1, 1972, through on or about April 15, 1974." The Government concedes, however, that the defendant did not file his 1973 return until on or about June 11, 1974, which is what Count Two, somewhat inconsistently, also charges.

 "In order for a variance between an indictment and proof at trial to be fatal to the prosecution, it must 'affect the substantial rights' of the accused." *United States v. Brozyna,* 571 F.2d 742, 745 (2d Cir. 1978) (citing *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). In the instant case, no substantial rights are affected, especially since the defendant will not be surprised by the Government's proof that his allegedly fraudulent return for 1973 was filed on or about June 11, 1974. Ordinarily, a variance between the actual date of the commission of the offense and the date charged is not grounds for reversal. *See, e. g.,* L. Orfield, *Criminal Procedure Under the Federal Rules* § 7:120, at 702 (1966 & Supp.1979). And since Count Two itself alleges that the defendant filed his 1973 return on or about June 11, 1974, the grand jury must have known of the evidence of that allegation.  Furthermore, the Court rejects the defendant's contention that the indictment is so incomprehensible that it fails to state a crime. "An indictment is sufficient if it contains the elements of the offense

charged and fairly informs a defendant of the charge against which he must defend and enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Chestnut,* 533 F.2d 40, 45 (2d Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). Measured against this standard, Count Two of the Indictment, which has been quoted above, more than adequately sets forth the acts the defendant is accused of committing.

### CONCLUSION

The motions by defendant, for dismissal of all or parts of the Indictment, and for suppression of evidence, are denied.

SO ORDERED.