**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Florence L. PETERS, Defendant– Appellant.**

No. 97–2634.

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1998.

Decided Aug. 17, 1998.

Joan B. Safford (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellee.

Cynthia Giacchetti, Chicago, IL, Sanford J. Boxerman, David V. Capes (argued), Rosenblum, Goldenhersh, Silverstein & Zafft, P.C., St. Louis, MO, for Defendant–Appellant.

Before EASTERBROOK, RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

After a jury trial, Florence L. Peters was convicted of four counts of making false statements on her tax returns in violation of

26 U.S.C. § 7206(1)[1] and one count of corruptly attempting to impede the administration of the internal revenue laws in violation of 26 U.S.C. § 7212(a).[2] On appeal, Dr. Peters contends that the district court erred in denying her motion to suppress evidence which, in her view, the IRS had obtained in violation of her Fourth and Fifth Amendment rights. In addition, Dr. Peters asserts that the evidence presented at trial was insufficient to support the jury's verdict. For the reasons discussed in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. The Contours of an IRS Investigation

The IRS splits the responsibility for enforcing the nation's tax laws between its two investigative divisions. The Criminal Investigative Division ("CID") is charged with investigating criminal violations of the tax code and related federal statutes. CID investigators are called "special agents." Like many other criminal law enforcement agents, they carry firearms and badges. In addition, special agents must recite an administrative warning prior to soliciting information from taxpayers. *See Beckwith v. United States*, 425 U.S. 341, 343, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (quoting warning provided by special agents).

On the other hand, the Examination Division of the IRS is responsible for conducting civil tax audits. Examination Division investigators are known as "revenue agents." In contrast to special agents, revenue agents do not carry firearms; nor are they required to provide taxpayers with an administrative warning. Although an Examination Division audit typically concludes with some sort of civil settlement between the IRS and the taxpayer, such an audit may uncover evidence that causes the revenue agent to refer the case to the CID for criminal investigation. Under IRS regulations, a revenue agent who uncovers a "firm indication of fraud on the part of the taxpayer" must immediately suspend her audit and refer the case to the CID. *See Internal Revenue Manual* § 4565.21(1). At that point, the CID enters the case and the IRS' efforts become focused on the possibility of criminal prosecution. *See generally* Michael I. Saltzman, *IRS Practice and Procedure* ¶¶ 12.01 & 12.03[1][a]. This case, in large part, concerns the distinction between a civil tax audit and a criminal tax investigation.

### B. The Investigation

In October 1988, Marshall Peters, the former husband of podiatrist Dr. Florence Peters, called the Internal Revenue Service to report that he had information indicating that Dr. Peters had been cheating on her taxes. Marshall's call was received by Special Agent Gerald Padar of the CID. On October 6, Special Agent Padar went to Marshall's home; there he met with Marshall and his new wife, Eloise. At that meeting, Marshall showed Padar original corporate

---

1. That section provides in pertinent part:

 § 7206. Fraud and false statements

 Any person who—

 (1) Declaration under penalties of perjury.- Willfully makes and subscribes any return, statement, or other document which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;

 . . . .

 shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

2. That section provides in pertinent part:

 § 7212. Attempts to interfere with administration of internal revenue laws

 (a) Corrupt or forcible interference.—Whoever corruptly or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force (including any threatening letter or communication) obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both, except that if the offense is committed only by threats of force, the person convicted thereof shall be fined not more than $3,000, or imprisoned not more than 1 year, or both. The term "threats of force", as used in this subsection, means threats of bodily harm to the officer or employee of the United States or to a member of his family.

checks for Dr. Peters' corporation,[3] checks that Marshall had received in connection with a child support suit. A few weeks later, Marshall provided Padar with photocopies of corporate checks allegedly used by Dr. Peters to pay personal expenses. Marshall and Eloise Peters ultimately provided Padar with more than 300 pages of documents, including photocopies of more than 400 checks that Dr. Peters allegedly wrote for personal expenses but deducted as business expenses.

Special Agent Padar held this information for 18 months but did not open a formal criminal investigation. Instead, he maintained a file on Dr. Peters in the bottom drawer of his desk, where he collected the information supplied by Marshall and Eloise. On a few occasions, Padar reviewed the checks in that file. In addition, on one occasion, Padar drove by Dr. Peters' home to see what he could glean about her lifestyle and to attempt to corroborate information he had received from Marshall and Eloise concerning an addition to Dr. Peters' home. During that time, Padar received a few calls from Marshall and Eloise seeking information on the progress of the investigation.[4] Padar informed them that, under IRS nondisclosure regulations, he could not tell them anything. In January 1990, Special Agent Padar "walked" the information across the hall to the Examination Division. At that time, he prepared a two-page handwritten summary reflecting the informants' view of Dr. Peters' tax violations. He included that summary with the file. Padar did no further investigation.[5]

Padar's file on Dr. Peters ultimately landed on the desk of Thomas Ridgeway, a group manager in the Examination Division. Ridgeway assigned the case to Revenue Agent Margo Thompson, whom he described as a "rookie" in corporate audits. The Peters case was Thompson's first corporate au-dit that needed significant further development. When Ridgeway passed the file on to Thompson, he informed her that the case had begun because of an informant's tip received by the CID. He instructed Thompson to meet with the informants and to conduct an audit to determine if Dr. Peters had, in fact, deducted personal expenses as business expenses. Nonetheless, Thompson did not prepare a written audit plan because, in her view, the audit was routine. Thompson held this view because she had worked on other cases that were prompted by an informant's tip but were treated as routine civil audits and did not evolve into criminal investigations.

Revenue Agent Thompson began her audit by inputting the checks on the computer and calling up Dr. Peters' 1987 and 1988 returns. On July 2, 1990, Thompson initiated the first IRS contact with Dr. Peters. Thompson sent a standard form letter to Dr. Peters notifying her that her corporate returns for 1987 and 1988 had been selected for an audit and requesting a meeting. Attached to the letter was the standard Information Document Request for a corporate audit, requesting numerous corporate and accountant records. Thompson also attached copies of two other documents which are routinely sent to the taxpayer when the IRS initiates a civil audit: (1) IRS Publication 1, a form called "Your Rights as a Taxpayer," and (2) IRS Notice 609, the "Privacy Act Notice." The purpose of IRS Publication 1 is to inform the taxpayer of her rights and some of the basic procedures and policies associated with a civil audit. The Privacy Act Notice informs the taxpayer of the IRS' legal right to ask for information, the reason the agency is asking for it ("to carry out the tax laws of the United States") and the consequences of failing to cooperate with the audit ("you may be charged penalties and, in certain cases, you

---

3. Dr. Peters practiced podiatry through a personal services corporation, Dr. Florence L. Peters, Ltd.

4. On an earlier occasion, Marshall and Eloise filled out a claim form seeking a reward for the disclosure of original information about a criminal violation of the Internal Revenue Code. The record does not indicate whether they ever received a reward for their assistance in this case.

5. On one occasion after he had given the file to the Examination Division, Eloise contacted Padar and suggested that Dr. Peters would attempt to deduct expenses incurred in connection with her daughter's Bat Mitzvah as business expenses on her 1990 tax return. Padar forwarded this information to the Examination Division.

may be subject to criminal prosecution"). The letter and attached forms contained no indication that the audit had been prompted by an informant's tip or that the case had been referred by the CID.

In response to this notice, Dr. Peters contacted the IRS and informed Thompson that her accountant, William Morrison, would represent her in the audit. Commencing shortly thereafter, Thompson conducted a series of personal meetings and telephone contacts with Morrison. During the course of these communications, Morrison asked Thompson whether she was conducting a "routine" or "ordinary" audit, and she replied in the affirmative. Although he did not remember Thompson specifically using the words "random" or "routine," he "absolutely" had the impression that it was a routine audit. Morrison came to this conclusion because of the normal manner in which Thompson was proceeding more than anything she said. Indeed, at the time of her initial meetings with Morrison, Thompson did not believe that any fraud was involved or that Dr. Peters had any criminal problems. She conducted the audit like any other. She did not inform Morrison that the investigation had been prompted by an informant's tip or referred by the CID.[6] Nor did she provide a verbal warning that Dr. Peters might be subject to criminal penalties. Accordingly, Morrison continued to provide information on the belief that it was a routine audit.[7]

On November 5, 1990, Thompson first met with Dr. Peters. Prior to this meeting, Thompson had discovered an apparent discrepancy of approximately $100,000 in Dr. Peters' tax filings. However, she did not know yet whether this was a real discrepancy. This initial meeting lasted about two hours. Thompson conducted the meeting in the same manner as any other civil audit. She did not give Dr. Peters any indication or warning that there might be a possible criminal problem. She used the standard computer-generated interview form and asked the same general questions that she would ask in any audit. At the meeting, Thompson reiterated requests for information concerning Dr. Peters' corporation in order to verify the purpose of various corporate expenditures claimed by Dr. Peters. At this point, Thompson did not believe there was fraud but had concluded that there were expenses that needed to be explained.

However, by March 1991, Thompson began to suspect that the case might involve fraud. On March 28, after Thompson received Morrison's signed power of attorney, she informed him that she had discovered approximately $200,000 in unreported income and that she had questions regarding the legitimacy of some claimed business expenses. A few days later during another conversation, Morrison stated: "If [Dr. Peters] didn't report $200,000, it would be a case that would be a referral to CID." R.121–4 at 518. Thompson did not respond. By April 30, 1991, Thompson had concluded that the case involved fraud and began to prepare a criminal referral. However, whether the case bore the "firm indications of fraud" necessary for a criminal referral was ultimately her supervisor's decision.

By that time, Thompson had a new supervisor, Bruce Wilson. Wilson reviewed the case and concluded that there were not "firm indications of fraud." After reviewing Thompson's work, he determined that there were too many errors in Thompson's analysis to substantiate a fraud referral. In particular, he believed that Thompson had disallowed all claimed expenses without analysis and had not given Dr. Peters adequate opportunity to prove the business deductions or to explain the apparent excess income. He concluded that there were "indicia of fraud" but decided that Dr. Peters should be given further opportunity to explain the discrepancies discovered by Thompson.

6. At this point, Thompson had not yet received a signed power of attorney authorizing Morrison to act on behalf of Dr. Peters' corporation. Accordingly, under IRS guidelines, she could receive information from Morrison but could not disclose any information to him concerning the investigation.

7. At the suppression hearing, Morrison testified that he would have discontinued the audit and advised Dr. Peters to retain an attorney if Thompson had informed him of any of these facts at the initiation of the audit.

In July 1991, Wilson reassigned the Peters matter to Revenue Agents Cynthia Lensink and Steven Mittl. He instructed Lensink to reanalyze the business expense deductions and Mittl to recalculate Dr. Peters' income using a bank deposit analysis. On November 4, 1991, Lensink met with Morrison and Dr. Peters' newly-retained attorney, Ben Roth. During that meeting, Lensink asked Roth if his client would sign a consent form to extend the civil statute of limitations, thereby giving the IRS more time to settle the case or bring a civil action against Dr. Peters. Roth responded that he would advise his client to sign the consent form. Lensink stated that she wished to bring the matter to a close quickly and that she had prepared a list of proposed adjustments for that purpose. Both Roth and Morrison assumed that Lensink was referring to a civil settlement. In addition, according to Roth, he asked Lensink at that meeting whether the case might be referred for criminal prosecution and she replied in the negative. Lensink, however, stated that Roth never asked her that question and that she never denied the possibility of a referral to the CID.

On December 17, 1991, Roth met with Lensink at Dr. Peters' home. The purpose of the visit was to observe Dr. Peters' claimed home office. At this meeting, Roth noticed a significant change in Lensink's attitude; she was no longer interested in reaching an agreement on the proposed adjustments. By this time, Lensink and Mittl had completed their analysis of both Dr. Peters' income and claimed business expenses. On December 19, 1991, the Revenue Agents completed a proposed criminal referral concerning Dr. Peters' 1988 and 1989 corporate and individual income tax returns. The proposed referral was submitted to Wilson. After reviewing the agents' work, Wilson concluded that the case was now sufficiently developed and that there were in fact "firm indications of fraud." Accordingly, he signed the referral. Morrison and Roth first learned of the referral in January of 1992.

After further review of the information compiled in the Examination Division audit, the CID recommended criminal prosecution of Dr. Peters. On April 11, 1995, a federal grand jury indicted Dr. Peters on four counts of criminal tax fraud. Counts I and III charged her with fraudulent conduct in violation of 26 U.S.C. § 7206(1) with regard to her corporate tax returns for 1988 and 1989. Those counts alleged that Dr. Peters had underreported her corporate income and had deducted personal expenses as business expenses on those returns. Counts II and IV charged her with making false statements on her personal returns for the same years in violation of § 7206(1). In addition, on November 14, 1995, the grand jury returned a superseding indictment. In that indictment, the grand jury added a fifth count. Count V charged Dr. Peters with obstructing the due administration of the Internal Revenue Code in violation of 26 U.S.C. § 7212(a).

### C. Proceedings in the District Court

Prior to her trial, Dr. Peters moved to suppress the records and statements that she had offered to the IRS auditors between April 1990 and January 1992. She asserted that the IRS obtained that evidence in violation of her Fourth and Fifth Amendment rights by telling her that they were conducting a routine civil audit when in fact they were carrying out a covert criminal investigation. After a six-day suppression hearing, the district court found that the civil revenue agents did not deliberately mislead Dr. Peters as to the nature of their investigation. Accordingly, the court denied Dr. Peters' motion to suppress. *See generally United States v. Peters*, 944 F.Supp. 646 (N.D.Ill. 1996).

After a lengthy trial in December 1996, a jury found Dr. Peters guilty on all five counts of the superseding indictment. Dr. Peters now asks this court to set aside her conviction on two grounds. First, she contends that the district court erred in denying her motion to suppress. In addition, she asserts that the evidence presented at trial was not sufficient to support the jury's verdict.

## II

## DISCUSSION

### A.

Dr. Peters contends that the district court erred in denying her motion to sup-

press the records and statements that she had offered to the IRS auditors between April 1990 and January 1992. She asserts that the IRS obtained that evidence in violation of her Fourth and Fifth Amendment rights by conducting a criminal tax investigation under the guise of a civil audit. On review of a district court's ruling on a motion to suppress, this court reviews questions of law de novo and questions of fact for clear error. *See United States v. Sholola*, 124 F.3d 803, 811 (7th Cir.1997). We shall conclude that a district court's factual finding is clearly erroneous only if we are left with the definite and firm conviction that a mistake has been made. *See United States v. Quinn*, 83 F.3d 917, 921 (7th Cir.1996).

### 1.

 A consensual search is unreasonable under the Fourth Amendment or violative of due process under the Fifth Amendment if the consent was induced by fraud, deceit, trickery or misrepresentation by the revenue agent.[8] *See United States v. Serlin*, 707 F.2d 953, 956 (7th Cir.1983); *United States v. Lehman*, 468 F.2d 93, 104 (7th Cir.1972), *cert. denied*, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972). In *Serlin*, we set forth the heavy burden that a defendant seeking suppression under this theory must meet:

> To prevail on this point defendant must produce clear and convincing evidence that the agents affirmatively mislead [sic] him as to the true nature of their investigation. Defendant must also prove that the misinformation was material in his decision to speak with the agents. Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant

inquired about the nature of the investigation and the agents' failure to respond was intended to mislead.

707 F.2d at 956 (internal citations omitted); *see also United States v. Stern*, 858 F.2d 1241, 1249 (7th Cir.1988).

We turn, then, to the first part of the *Serlin* inquiry: Whether the civil revenue agents affirmatively misrepresented the nature of their investigation to Dr. Peters and her representatives. The district court found that the revenue agents, through their conduct and words, represented to Dr. Peters that they were conducting an ordinary or routine civil audit. Accordingly, if the agents were in fact conducting a criminal investigation under the auspices of a civil audit, then they affirmatively misrepresented the nature of their investigation. *See United States v. Wadena*, 152 F.3d 831, 1998 WL 47709 (8th Cir.1998); *United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir.1993); *United States v. Nuth*, 605 F.2d 229, 234 (6th Cir.1979); *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir.1977); *see also Internal Revenue Manual* § 9311.83(1) (stating that the IRS may not develop a criminal tax case under the guise of a civil audit). In addressing this issue, the district court noted that, under IRS guidelines, "a civil audit evolves into a criminal investigation at the point when the auditors develop a firm indication of fraud." *United States v. Peters*, 944 F.Supp. 646, 654 (N.D.Ill.1996). Therefore, the court held that it would "find that the revenue agents were engaged in a covert criminal investigation if they continued to audit defendant after they developed a firm indication of fraud." *Id.*

 We believe that the district court's approach to this issue is a sound one. Although this court has not yet addressed the precise issue presented in this case,[9] other

---

8. Because all of the constitutional violations alleged by Dr. Peters depend on a showing of the existence of fraud, deceit and trickery, it is not necessary to discuss each constitutional claim separately. *See United States v. Prudden*, 424 F.2d 1021, 1032 (5th Cir.1970), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

9. *In United States v. Mapp*, 561 F.2d 685 (7th Cir.1977), we addressed the "firm indications of

fraud" standard in a slightly different context from the one we encounter here. In this case, Dr. Peters argues that the evidence obtained by the IRS during its civil audit should be suppressed because the IRS obtained that evidence by fraud, trickery, deceit and misrepresentation in violation of her Fourth and Fifth Amendment rights. By contrast, in *Mapp*, the taxpayer-defendant did not cast his argument in constitutional terms, but rather argued that the evidence ob-

courts that have addressed the issue have relied on the "firm indications of fraud" rule as a good benchmark for determining whether the IRS has attempted to conduct a criminal investigation under the guise of a civil audit. *See, e.g., Wadena*, 152 F.3d at 851 (requiring defendant seeking suppression of evidence to show that IRS continued with civil audit after it developed firm indications of fraud);[10] *Groder v. United States*, 816 F.2d 139, 142 (4th Cir.1987) (holding that continuation of civil audit after the development of firm indications of fraud is relevant to issue of whether agency conducted investigation in good faith); *United States v. Piper*, 681 F.Supp. 833, 837 (M.D.Ga.1988) (same). Indeed, when examining whether a revenue agent has misrepresented the true nature of her investigation, it is appropriate to consider the procedures and regulations under which she functions, including the "firm indications of fraud" rule:

> If, during an examination, an examiner discovers a firm indication of fraud on the part of the taxpayer, the tax return preparer, or both, the examiner shall suspend his/her activities at the earliest opportunity without disclosing to the taxpayer, the taxpayer's representative, or employees, the reason for such suspension.

*Internal Revenue Manual* § 4565.21(1). Therefore, if a revenue agent continues to conduct a civil audit after developing "firm indications of fraud," a court may justifiably conclude that the agent was in fact conducting a criminal investigation under the auspices of a civil audit.

Nonetheless, as the district court noted, the "firm indications of fraud" standard is a difficult standard for federal courts to apply because it is inherently vague and depends,

---

tained by the IRS during a civil audit should be suppressed because the revenue agents conducting the audit failed to refer the case to the CID after they developed "firm indications of fraud" in violation of the guidelines in the Internal Revenue Manual. In the first place, we held that the rules in the Internal Revenue Manual were adopted for the internal administration of the service and not for the protection of the taxpayer and therefore "conferred no rights on the taxpayer." *Id.* at 690 (citing *United States v. Lockyer*, 448 F.2d 417, 420–21 (10th Cir.1971)). We went on to conclude that the IRS rules concerning criminal referral were not violated in that case.

In *Serlin*, although we dealt with the issue of deception during the course of the IRS investigation, that case involved a taxpayer who was aware of the criminal nature of the investigation but did not realize that he was a potential target of that inquiry. Indeed, the *Serlin* court noted that its case differed from the "typical deceit case," which "involves a taxpayer who claims that his volubility was induced by assurances that the investigation was 'routine' and only civil rather than criminal." *See Serlin*, 707 F.2d at 957.

**10.** We note that the approach we adopt today differs slightly in its articulation from the formula set forth by the Eighth Circuit in *Wadena* and *Grunewald*. In those cases, the Eighth Circuit set forth the following standard:

> Evidence obtained in the course of a criminal investigation, where the defendant has not been apprised of the nature of the investigation, may be suppressed only if the defendant establishes that:

(1) the IRS had firm indications of fraud by the defendant, (2) there is clear and convincing evidence that the IRS intentionally misled the defendant, and (3) the IRS's conduct resulted in prejudice to defendant's constitutional rights.

*Wadena*, 152 F.3d at 851 (quoting *Grunewald*, 987 F.2d at 534). This articulation differs slightly from the formulation that we enunciated in *Serlin* in that the Eighth Circuit sets forth a "firm indications of fraud" test as an additional showing a defendant must make in order to succeed on a motion to suppress evidence obtained by the IRS during a civil audit. We agree with the Eighth Circuit, for the reasons discussed *infra*, that the "firm indications" rule is an important guide for courts that encounter a motion to suppress based on the allegation that the IRS has obtained evidence through fraud, trickery, deceit and misrepresentation. However, rather than articulating this factor as independent from a showing that the IRS affirmatively and intentionally misled the defendant, we believe that the "firm indications" rule is best utilized as a tool for assessing whether the IRS has affirmatively misrepresented the nature of its investigation by conducting a criminal investigation under the guise of a civil audit. We do not believe that the Eighth Circuit's formulation is a doctrinal departure from the approach in *Serlin*. Indeed, in *Grunewald*, the Eighth Circuit stressed that the essence of its approach was the presence of affirmative and intentional misleading by the IRS. *See* 987 F.2d at 534 ("If IRS agents, exercising sound discretion and good judgment, fear suppression of evidence where no intentional, prejudicial misrepresentation is afoot, civil audits will prematurely and unnecessarily be referred to CID.").

in large part, on the good faith and professional judgment of the revenue agents conducting the investigation at issue. When applying this standard, federal courts must navigate between two perils. On the one side, courts face the Scylla of judicial micromanagement of the inner functionings of an administrative agency, a peril recognized by many of the courts that have addressed this issue.[11] Yet, on the other side, courts face the Charybdis of judicial abdication of their Article III duty to protect the constitutional rights of criminal defendants. As the district court recognized, this latter peril will be realized if the courts are forced to rely solely on the after-the-fact assessments of revenue agents who may have an incentive to use the discretionary nature of the "firm indications" rule to shield their actions from judicial scrutiny.

In navigating the narrow course necessitated by these two perils, courts must remember that the "firm indications of fraud" rule is but a tool for courts to utilize in determining whether the revenue agents made an *affirmative misrepresentation* to a defendant or her representatives concerning the nature of their investigation. Although we are mindful that the "firm indications of fraud" rule cannot be expressed in a set of absolute criteria and that the facts and circumstances of each case must be assessed in their own light, we believe that the following discussion can serve as a guide to the courts who are called upon to navigate these narrow waters in the future. Our review of the relevant case law suggests several considerations that ought to be helpful to the district courts.

The IRS has been found to have engaged in impermissible deception if the Service has conducted a civil audit at the behest of a criminal law enforcement agency conducting an ongoing criminal investigation. This rule is based on the Fifth Circuit's holding in *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir.1977) and has been explicitly embraced by the IRS. See Internal Revenue Manual § 9311.83(1) (stating that "under no circumstances" should the Service "develop a criminal tax case under the guise of a civil audit"); cf. *United States v. Lehman*, 468 F.2d 93, 105 (7th Cir.1972) (stating that "the appellate court cases dealing with fraud in tax situations warn that revenue agents must not affirmatively mislead a taxpayer into believing that the investigation is exclusively civil in nature and will not lead to criminal consequences" (collecting cases)), *cert. denied*, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972). In *Tweel*, the Examination Division began a civil audit of the taxpayer at the specific request of the Organized Crime and Racketeering Section of the Department of Justice. Thus, the audit was, in effect, conducted as part of an ongoing criminal investigation. In an attempt to ascertain the nature of the investigation, the taxpayer's representative asked the revenue agent if a special agent was involved in the investigation; the revenue agent answered in the negative. Although the revenue agent's answer was technically correct, the court found that he knew the purpose of the representative's question and that, therefore, his answer amounted to affirmative deceit. "[T]he agent's failure to apprise the appellant of the obvious criminal nature of this investigation was a sneaky deliberate deception by the agent ... and a flagrant disregard for appellant's rights. The silent misrepresentation was both intentionally misleading and material." *Tweel*, 550 F.2d at 299. The court further cautioned: "Our revenue system is based on the good faith of the taxpayers and

---

11. *See Grunewald*, 987 F.2d at 534 ("If IRS agents, exercising sound discretion and good judgment, fear suppression of evidence where no intentional, prejudicial misrepresentation is afoot, civil audits will prematurely and unnecessarily be referred to CID."); *United States v. Michaud*, 860 F.2d 495, 498–99 (1st Cir.1988) (holding that courts must give considerable weight to the IRS' own interpretation of their regulations); *United States v. Caldwell*, 820 F.2d 1395, 1402 (5th Cir.1987) (noting that referral decision was discretionary in nature and was not governed by any absolute criterion); *United States v. Groder*, 816 F.2d 139, 143–44 (4th Cir.1987) (holding that second-guessing a revenue agent's judgment should not become a routine chore for judges because the administration of the revenue laws is a function which by congressional directive and by expertise belongs to the IRS, and warning that a less deferential approach "would encourage premature referrals of taxpayers for fraud investigations based on little more than a revenue agent's unsubstantiated hunch").

the taxpayers should be able to expect the same from the government in its enforcement and collection activities." [12] *Id.* at 300.

Active involvement of CID personnel in a civil audit prior to the completion of a criminal referral also has been treated as compelling evidence that the IRS has proceeded beyond the point of "the firm indications of fraud" and attempted to use the audit as a covert criminal investigation. *See United States v. Caldwell*, 820 F.2d 1395, 1399 n. 4 (5th Cir.1987); *United States v. Robson*, 477 F.2d 13, 17 (9th Cir.1973); *United States v. Smith*, 898 F.Supp. 464, 468 (W.D.Ky.1995); *United States v. Piper*, 681 F.Supp. 833, 838 (M.D.Ga.1988). This principle has its roots in the fact that the IRS, in an effort to comply with *Tweel* and its progeny, has constructed a "Chinese wall" between its civil examination and criminal investigation divisions.[13] Indeed, IRS guidelines specifically warn that revenue agents who are in the process of determining the appropriateness of a criminal referral must not "obtain evidence and/or direction from the Criminal Investigation Division for a specific case that is under examination." [14] *Internal Revenue Manual* § 4565.21(1). Conversely, a special agent who refers a case to the Examination Division as lacking in criminal potential must withdraw from the case under most circumstances. See *id.* at § 4565.7.

Continuation of audit activities after the revenue agent begins preparation of the fraud referral also may be indicative of an agency attempt to gather information for a criminal prosecution while keeping the taxpayer in the dark as to the true nature of its investigation. *See, e.g., United States v. Wadena*, 152 F.3d 831, 851 (8th Cir.1998). Indeed, the Manual clearly directs a revenue agent to suspend her activities at the earliest opportunity after developing firm indications of fraud. *See Internal Revenue Manual* § 4350 HB 22(34); *see also* Michael I. Saltzman, *IRS Practice and Procedure* ¶ 12.03[1][a] ("The IRS instructs its personnel to be alert to indications of fraud and, when fraud is spotted, to suspend their civil activities and refer the case to CID."). Similarly, another Manual provision bars a revenue agent from "solicit[ing] an agreement or solicit[ing] and receiv[ing] delinquent returns prior to the submission of a fraud referral, if a referral is being considered." *Internal Revenue Manual* § 4565.21(1). Accordingly, if a revenue agent has determined that a case

---

**12.** *See United States v. Groder*, 816 F.2d 139, 144 (4th Cir.1987) ("[B]ad faith would arise if a revenue agent misrepresented to taxpayer the possibility of referral in order to elicit information for use in a fraud investigation. For the agent to obtain information in such a manner would destroy whatever reservoir of trust remains in citizen taxpayers and discourage the cooperation that might resolve matters in a prompt and satisfactory way."); *see also United States v. Piper*, 681 F.Supp. 833, 837 (M.D.Ga.1988) (" 'Inherent in our democracy is a belief that, since the government represents the will of the people, the people will accept its dictates voluntarily. There is a sense of trust between the government and the people.... [Therefore], a private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations. [It is] clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust.' " (*quoting SEC v. ESM Government Sec., Inc.*, 645 F.2d 310, 316 (5th Cir.1981))).

**13.** Under the IRS guidelines, a special agent may not participate in a civil audit. However, a revenue agent may participate in a joint investigation with the CID; once a joint investigation is undertaken, the criminal aspects of the investigation take precedence and the IRS must present the investigation to the taxpayer as such. See Internal Revenue Manual §§ 9311.83(1) & (31)610; see generally Michael I. Saltzman, IRS Practice and Procedure ¶ 12.01 (In recognition of the fact that attempts to pursue the criminal and civil aspects of a case concurrently can jeopardize successful prosecution of a criminal case, "the Service's policy is that criminal action in a case takes precedence over its civil aspects and that any civil enforcement action involving the same tax and periods as an active criminal investigation is suspended or deferred until the criminal aspects of the case are closed.").

**14.** Cf. *Robson*, 477 F.2d at 17 (finding that revenue agent was not conducting covert criminal investigation because he had no instructions from CID, no interim conferences with CID personnel, and "was under no obligation to report to it unless his audit uncovered an indication of fraud").

must be referred to the CID yet continues her regular audit activities in the interim, such behavior suggests an intent to gather evidence for a criminal prosecution under the aegis of a civil audit.

The case law suggests that a revenue agent has developed a firm indication of fraud when she has established that the taxpayer has engaged in a consistent pattern of substantial underreporting of income and/or overstatement of deductions such that an intent to evade taxes can be inferred. See Internal Revenue Manual § 4231 HB 940(1)(a)-(b), (f)1; see also United States v. Grunewald, 987 F.2d 531, 534 (8th Cir.1993). Such a pattern is usually established only after the revenue agent has examined the taxpayer's returns filed over a period of several years. See United States v. Lockyer, 448 F.2d 417, 419–20 (10th Cir.1971) (noting that evidence showed "a pattern of substantial understatements" for a three-year period and stating that referral is appropriate upon "discovery of a substantial understatement coupled with an indication that the understatement was deliberate"). Accordingly, once a revenue agent has discovered solid evidence that a taxpayer has engaged in a consistent pattern of this type of behavior, a court may infer that the revenue agent has developed "firm indications of fraud."

The case law recognizes that an assessment of the taxpayer's intent is the most critical element in a revenue agent's determination of whether "firm indications of fraud" exist in any particular case. See Caldwell, 820 F.2d at 1402–03; United States v. Groder, 816 F.2d 139, 143–44 (4th Cir.1987); Piper, 681 F.Supp. at 838. Indeed, it is the taxpayer's intent to evade taxes that differentiates a criminal violation from a civil case. For this reason, a revenue agent who discovers potential violations of the revenue laws will almost always give the taxpayer an opportunity to explain the violations before determining the appropriateness of a criminal referral. See Internal Revenue Manual § 4565.21(1); see generally United States v. Kaatz, 705 F.2d 1237, 1242 (10th Cir.1983)

(revenue agent interviewed taxpayers and their accountant on a number of occasions prior to referral). This step is viewed as a necessity because, given the complexity of the tax code, many innocent explanations exist for unreported income. See Groder, 816 F.2d at 143 ("[A] failure to report income correctly 'may be due to mistake, inadvertence, reliance on professional advice, honest difference of opinion, negligence or carelessness, none of which constitutes deliberate intent to defraud.'" (quoting Internal Revenue Manual § 4231 HB 933)). Once the revenue agent has interviewed the taxpayer, he must assess the taxpayer's explanation. During that process, the revenue agent may consider the proffered explanation in light of that particular taxpayer's knowledge of taxes and business practices. See Internal Revenue Manual § 4231 HB 940(1)(e)3.[15] In fact, one court has held that a revenue agent engages in constructive dishonesty when she continues a civil audit after receiving an incredible explanation from a taxpayer with extensive knowledge of the tax laws. See United States v. Toussaint, 456 F.Supp. 1069, 1071–72 (S.D.Tex.1978).

Finally, a firm indication of fraud should be distinguished from a first indication of fraud. This principle is set forth clearly in the Manual:

> · A firm indication of fraud must be distinguished from a first indication of fraud. A first indication of fraud can be described as a mere suspicion of fraud. Examiners are legally permitted and should endeavor to ask the taxpayer, the preparer, the representative, or any other involved party for an explanation of the "discrepancies" which are the basis of the examiners[?] suspicion of fraud and any other question(s) which will resolve the question of the taxpayer's intent. The determination of firm indication of fraud is a factual determination which can only be determined on a case by case basis. An examiner who is in doubt should consult with his/her group

---

**15.** That subsection also gives other examples of conduct by taxpayers evidencing an intent to evade taxes: false statements, attempts to hinder examination (e.g., failure to answer questions and repeated cancellations of appointments), testimony of employees regarding irregular business practices, destruction of books and records, or transfer of assets for the purpose of concealment.

manager and/or Examination Fraud Coordinator to determine if the indicators of fraud are sufficiently developed. *Internal Revenue Manual* § 4565.21(1); *see also id.* at § 52(10)1.2(3) ("Firm indications of fraud confirm, support, and add to initial suspicions of fraud."). Revenue agents must take adequate steps to perfect indications of fraud and must ensure that the fraud is substantial prior to making a referral to the CID. *See id.* at § 52(10)1.2(3)(a)-(d); see also Saltzman, IRS Practice and Procedure ¶ 12.03[1][a]. This development is necessary because the CID must have sufficient information from which "to evaluate the criminal potential of the case." Internal Revenue Manual § 4231 HB 981; *see also Caldwell*, 820 F.2d at 1402–03. The courts that have addressed this issue have embraced this rule and have cautioned that "mere suspicion" should not be equated with firm indications of fraud. *See United States v. Powell*, 835 F.2d 1095, 1100 (5th Cir.1988); *Caldwell*, 820 F.2d at 1402–03; *Groder*, 816 F.2d at 143. "[I]f a firm indication is taken to mean the same thing as a mere suspicion, taxpayers would be subject to fraud investigations as a matter of course, and 'the revenue agent would have to cease almost before he started his investigation.'" *Caldwell*, 820 F.2d at 1397 (quoting *United States v. Lockyer*, 448 F.2d 417, 421 (10th Cir.1971)); *see also Grunewald*, 987 F.2d at 534 ("If IRS agents, exercising sound discretion and good judgment, fear suppression of the evidence where no intentional, prejudicial misrepresentation is afoot, civil audits will prematurely and unnecessarily be referred to CID.").

We emphasize that the law of this circuit remains the test established in *Serlin*. A consensual search is unreasonable under the Fourth Amendment or violative of the due process clause of the Fifth Amendment if the consent was induced by fraud, deceit, trickery or misrepresentation by the revenue agents. For those elements to be present, the defendant must establish that the agents affirmatively misled her as to the true nature of their investigation and that this affirmative misleading was a material factor in her decision to give information to the agents. With respect to the first factor—whether affirmative misleading took place—

we believe, as do the other circuits that have addressed the question, that the "firm indications of fraud" rule serves a useful function in guiding the district court's inquiry on the ultimate question as to whether there has been a deliberate misleading by the government. The foregoing discussion notes circumstances that, when present, have suggested strongly to reviewing courts that deceit and trickery amounting to such an affirmative misrepresentation have occurred. In identifying such circumstances, courts have viewed with a jaundiced eye the IRS' deviations from its own rules and regulations. That does not mean, of course, that such a deviation is sufficient, standing alone, for exclusion of evidence. *See United States v. Caceres*, 440 U.S. 741, 755–57, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *see also United States v. Mapp*, 561 F.2d 685, 690 (7th Cir. 1977) (holding that rules in Internal Revenue Manual were adopted for the internal administration of the IRS and therefore conferred no substantive rights on the taxpayer). It simply means that such deviations are relevant and probative evidence on the issue of whether the requisite affirmative misleading by the government has in fact occurred.

2.

We now apply these principles to the case at hand and address the issue of whether the revenue agents made affirmative misrepresentations to Dr. Peters concerning the nature of their investigation. In this case, we must review four stages of the IRS' civil audit of Dr. Peters: (1) Special Agent Padar's initial involvement in this case and his subsequent referral of the matter to the Examination Division; (2) Revenue Agent Thompson's investigation prior to her preparation of a fraud referral; (3) Bruce Wilson's decision to reject Thompson's referral and to continue the civil audit of Dr. Peters; and (4) the investigation of Revenue Agents Lensink and Mittl prior to their preparation of the fraud referral.

■ We turn first to the issue of whether the IRS engaged in affirmative deceit by conducting a civil audit of Dr. Peters after Special Agent Padar's initial involvement in

the case. As we noted earlier, this case began when the CID received an "information item" from Marshall Peters, Dr. Peters' ex-husband. Padar then spoke with the informants (Marshall and his new wife), received evidence from them, drove by Dr. Peters' house to corroborate information given to him by the informants and maintained a file on Dr. Peters in the bottom drawer of his desk for 18 months. However, Padar ultimately "walked" the file across the hall to the Examination Division. Dr. Peters contends that the fact that the IRS' investigation of her began in the CID and was prompted by the informant's tip indicates that the Service had "firm indications of fraud" prior to Padar's decision to walk the file across the hall to the Examination Division. Accordingly, she asserts that the IRS violated her constitutional rights by using the civil audit as a covert means to obtain evidence for a criminal prosecution.

■ The district court's finding that the IRS had not developed "firm indications of fraud" at the time Padar walked the file across to the Examination Division is not clearly erroneous.[16] The case law is clear that the fact that the investigation was prompted by an information item and therefore originated in the CID is not sufficient to establish a firm indication of fraud. *Caldwell*, 820 F.2d at 1399–1401; *Robson*, 477 F.2d at 17; *Piper*, 681 F.Supp. at 838. Indeed, it is the standard procedure of the IRS to channel information items through the CID, *see Internal Revenue Manual* § 9781 HB 3(10)3.2, and only a small number of the large quantity of information items received ever develop into fraud investigations, *see*

Saltzman, *IRS Practice and Procedure* ¶ 12.03[1][c]. Moreover, in this case, there was no evidence that Padar remained involved in the investigation after it was referred to the Examination Division or that he made any recommendations or provided any advice to the revenue agents concerning their investigation.[17] Accordingly, unlike *Tweel*, this was not a case in which a criminal law enforcement agency requested that the IRS conduct a civil audit as part of an ongoing investigation. Finally, we agree with the district court that the information provided to Padar by Dr. Peters' exhusband was not sufficient, standing alone, to constitute a firm indication of fraud. Considering the source, there was good reason for the IRS to follow its standard procedure of perfecting first indications of fraud by, among other things, giving the taxpayer an opportunity to explain the alleged violation. Cf. *Grunewald*, 987 F.2d at 533 (after receiving tip from partner of taxpayer, revenue agent sought to determine whether the allegations were true or merely the result of animosity toward the taxpayer); *Robson*, 477 F.2d at 14 (tip called into CID by taxpayer's ex-fiancee).

We turn next to the issue of whether Revenue Agent Thompson developed "firm indications of fraud" prior to the preparation of her criminal referral. As the district court found, the record contains uncontroverted evidence that Thompson-through her words and actions—represented her audit as an ordinary or routine civil audit. Based on the record before us, we cannot conclude that the district court's finding that Thompson's representations were honest is clearly errone-

---

**16.** We note at the outset that the IRS did not have an affirmative duty to warn Dr. Peters or her representatives that the audit could lead to criminal consequences or that it was prompted by an informant's tip. *See United States v. Serlin*, 707 F.2d 953, 956 (7th Cir.1983); *see also United States v. Knight*, 898 F.2d 436, 438 (5th Cir. 1990); *United States v. Meier*, 607 F.2d 215, 216–17 (8th Cir.1979), cert. denied, 445 U.S. 966, 100 S.Ct. 1658, 64 L.Ed.2d 243 (1980); *Robson*, 477 F.2d at 17; cf. 26 U.S.C. § 6103(i)(6) (prohibiting the IRS from disclosing "any return or return information" that "would identify a confidential informant"); Internal Revenue Manual § 9373.1(1) (identity of informants must not be divulged to taxpayer under investigation).

**17.** Dr. Peters makes much of the fact that, on one occasion, the informants contacted Padar with additional information after the investigation had been transferred to the Examination Division and that Padar passed this new information along to Revenue Agent Thompson. The evidence in the record shows that Padar was the passive recipient of this information and that, at the time he received it, he was no longer investigating Dr. Peters. The fact that he passed that information along to the branch of the Service currently handling the investigation hardly constitutes active involvement in the audit.

**458**

ous.[18] At the suppression hearing, Thompson testified repeatedly that, in her view, the audit was routine. She testified further that her view of the audit as routine was not changed by the fact that it was a referral from the CID and had been prompted by an informant's tip. In fact, she had worked on other "informant cases" that did not turn out to be fraud. Moreover, as we noted above, it is standard IRS procedure to route informant tips through the CID, yet few ever develop into full-scale criminal investigations.[19] Finally, Thompson testified that, at the time of her initial meeting with Dr. Peters on November 5, 1990, she had concluded that there were discrepancies in Dr. Peters' tax returns that needed to be explained but had not yet developed firm indications of fraud. Thompson's decision to interview Dr. Peters and to give her the opportunity to explain the discrepancies was consistent with both IRS procedures and the relevant case law. See Internal Revenue Manual sec.sec.

4565.21(1) (distinguishing first indications of fraud from firm indications and instructing revenue agent to seek explanation from taxpayer or her representative for any discrepancies) & 4231 HB 981 (stating that revenue agent must develop initial indications of fraud prior to referral in order to provide CID with sufficient information from which "to evaluate the criminal potential of the case"); accord Caldwell, 820 F.2d at 1402–03; Groder, 816 F.2d at 143–44; Piper, 681 F.Supp. at 838.

The next stage of the investigation we must examine is the period immediately following Thompson's submission of her proposed referral to the CID. As we noted earlier, Thompson submitted her fraud referral to her supervisor Bruce Wilson in May 1991. However, after reviewing the case, Wilson concluded that there were not "firm indications of fraud" because Thompson had made

---

**18.** Dr. Peters relies heavily on the fact that Thompson's supervisor, Bruce Wilson, testified that it was improper for a revenue agent to characterize her audit as "routine" or "random." Dr. Peters contends that Thompson made such characterizations in response to the inquiries of her accountant, William Morrison. However, Morrison testified that he did not remember Thompson specifically using the words "random" or "routine." Instead, he concluded that the audit was routine from the ordinary way in which Thompson was proceeding. In any event, even if Thompson did characterize the audit as "routine" during her initial meetings with Morrison, such a characterization does not amount to an affirmative misrepresentation because, as discussed above, Thompson did view the audit as routine at that time. Cf. Piper, 681 F.Supp. at 839 (agent's characterization of audit as "routine" did not amount to affirmative misrepresentation).

**19.** Dr. Peters also contends that Thompson misrepresented the nature of her audit by mailing her IRS Publication 1, a form entitled "Your Rights as a Taxpayer" and IRS Notice 609 ("The Privacy Act Notice") at the initiation of the audit. The IRS sends these forms to taxpayers at the inception of routine, ordinary audits, but does not mail them to the targets of a criminal investigation. As we concluded above, the district court's finding that Thompson believed herself to be engaged in a routine and ordinary civil audit is not clearly erroneous. Accordingly, to the extent her decision to mail Publication 1 was consistent with the Service's practices at the inception of a routine civil audit, it was not an affirmative misrepresentation. In addition, the

documents themselves contain no statements which amount to an affirmative misrepresentation of the Service's understanding of the case at the time they were mailed.

Similarly, Dr. Peters asserts that the suppression of the evidence is required in this case based on the Taxpayer Bill of Rights of 1988 (as distinct from her constitutional arguments). See Pub.L. No. 100–647, §§ 6226–6247, 102 Stat. 3342, 3730–3752 (1988) (codified as amended in scattered sections of 26 U.S.C.). Section 6227 of that law required the IRS to "prepare a statement which sets forth in simple and nontechnical terms—(1) the rights of the taxpayer and the obligations of the Internal Revenue Service during an audit." Id. at § 6227(a). The statute further required the statement to "be distributed ... to all taxpayers the Secretary contacts with respect to the determination or collection of any tax (other than providing tax forms)." Id. at § 6227(c). In response to this statutory directive, the IRS developed Publication 1. Because that document was provided to her by statutory directive, Dr. Peters asserts that any misrepresentations in Publication 1 would require suppression of the evidence obtained by the IRS during the civil audit. We note, at the outset, that the Taxpayer Bill of Rights contains no provision providing for suppression of the evidence as a remedy. However, because we conclude that Publication 1 contains no affirmative misrepresentations concerning the Service's understanding of the case at the time it was mailed, we need not decide whether the Taxpayer Bill of Rights of 1988 provides a viable ground for the suppression of evidence in a criminal tax proceeding.

too many errors in her analysis and had not provided Dr. Peters with an adequate opportunity to provide an explanation for the discrepancies noted by Thompson. Accordingly, the civil audit continued, albeit under the direction of two new revenue agents.

The IRS did not act improperly by continuing its audit of Dr. Peters after Thompson initiated her fraud referral in the Spring of 1991. The IRS guidelines specifically instruct revenue agents to consult with their supervisors in determining whether a particular audit is ripe for referral to the CID. See Internal Revenue Manual § 4565.21(1). Moreover, there is nothing in the record which suggests that Wilson did not honestly believe that Thompson's work was faulty and needed further development and that Dr. Peters should be given further opportunity to explain the discrepancies noted by Thompson. In fact, the explanation offered by the IRS in this case is nearly identical to the one accepted by the Fifth Circuit in *United States v. Powell*, 835 F.2d 1095, 1096–97 (5th Cir.1988). In Powell, an inexperienced revenue agent concluded that there were "firm indications of fraud" and began preparing a criminal referral. *See id.* However, her supervisor instructed her to perform additional tests to verify her conclusion before completing her referral. *See id.* The Fifth Circuit held that the Agency's approach in that case did not amount to fraud, deceit and trickery, but rather was consistent with guidelines set forth in the Internal Revenue Manual. *See id.* at 1101 ("We view the careful approach of the Manual as a wise and praiseworthy safeguard against the whimsical disregard of taxpayers' rights by decisions of agents who, through inexperience, might otherwise act too quickly or impetuously."); *see also Caldwell*, 820 F.2d at 1397. Similarly, in this case, we conclude that Wilson's decision to develop the audit further was consistent with the directives in the Internal Revenue Manual and was not part of an effort to conduct a covert criminal investigation.

We now turn to the final stage of the civil audit and examine the actions of Revenue Agents Lensink and Mittl prior to their re-

ferral of this matter to the CID. Based on the record before us, we cannot conclude that the district court's finding that Lensink and Mittl did not develop firm indications of fraud prior to their initiation of the criminal referral is clearly erroneous. As we noted earlier, in November 1991, Lensink asked Dr. Peters' attorney if his client would sign a consent form to extend the three-year civil statute of limitations. *See* 26 U.S.C. § 6501(a). As the district court noted, this request strongly suggests that, at that point, the IRS was still pursuing a civil case and that the revenue agents had not yet developed "firm indications of fraud." Indeed, such an extension would be unnecessary if the Service had already made the decision to pursue either civil fraud charges (with no statute of limitations) or to commence a criminal prosecution (with a six-year statute of limitations). *See id.* at §§ 6501(c)(1) & 6531.

In light of the foregoing discussion, we conclude that the district court's finding that the IRS did not engage in affirmative deceit during its audit of Dr. Peters is not clearly erroneous.[20] In addition, we note that the district court's legal analysis of this issue was guided by sound principles. The court properly looked to both the internal guidelines of the IRS and the existing case law.

### B.

We turn now to Dr. Peters' contention that the evidence presented at trial was not sufficient to support the jury's verdict. First, with respect to Counts I and III, which charged Dr. Peters with making false statements on her corporate returns, she contends that the government's proof was insufficient because, at trial, the government calculated her taxes using a method of accounting different from the method used by her accountant in preparing her corporate returns. Second, with respect to Counts II and IV, which charged Dr. Peters with making false statements on her personal returns, she asserts that the government's proof was insufficient because the government failed to present any proof that the unreported income diverted from her corporation represented

---

**20.** Accordingly, we need not reach the second prong of the *Serlin* inquiry—whether the agents'

representations were material to Dr. Peters' decision to cooperate with the IRS during the audit.

taxable "constructive dividends" rather than nontaxable return of capital. In evaluating Dr. Peters' challenges to the sufficiency of the evidence, we review the evidence in the light most favorable to the government and shall reverse only if no rational jury could have found Dr. Peters guilty beyond a reasonable doubt. *See United States v. Jean*, 25 F.3d 588, 595 (7th Cir.1994).

### 1. Counts I & III: Accrual v. Cash Basis

■ Dr. Peters contends that the government's evidence with respect to Counts I and III (charging her with making false statements on her 1988 and 1989 corporate returns) was not sufficient to support the jury's verdict because the government's proof used a different method of accounting from that used by her accountant. The government used the cash basis method of accounting to make its case against Dr. Peters; however, she asserts that her accountant used the accrual method. In making this argument, Dr. Peters points to her corporate tax returns. On those returns, her accountant clearly checked the box indicating that the corporation was an accrual basis taxpayer. However, despite the marking on the return, Dr. Peters' accountant testified repeatedly that he used the cash basis method to prepare her corporate returns. This conflicting evidence was put before the jury during the course of the trial, and it chose to credit the accountant's testimony that Dr. Peters was in fact a cash basis taxpayer. We shall not second-guess the jury's determination on appeal.

### 2. Counts II and IV: Constructive Dividends

Dr. Peters' second contention involves Counts II and IV, which charged her with making false statements on her individual returns. In those counts, the government alleged that Dr. Peters diverted corporate funds into her personal accounts and that she made corporate expenditures for her personal benefit. These funds were not reported on either her corporate or personal return. Dr. Peters contends that the government failed to prove that she received such income because it did not prove that her corporation

had sufficient earnings and profits in the relevant years to pay "constructive dividends." In her view, the government was required to put forward such proof in order to show that any diverted funds constituted taxable income to her rather than nontaxable return of capital.

■ In making this argument, Dr. Peters relies on the rule used in several civil tax cases involving the proper characterization of corporate funds which have been diverted to the sole shareholder of a wholly-owned corporation. In such a case, the government must provide evidence of corporate earnings and profits to show that the money "skimmed" by the taxpayer was a taxable "constructive dividend" as opposed to nontaxable return of capital. *See e.g., Truesdell v. Commissioner*, 89 T.C. 1280, 1298, 1987 WL 258105 (1987). However, the majority of courts that have addressed this same situation in the context of a criminal proceeding have held that the government need not prove the character of the diverted funds. *See United States v. Williams*, 875 F.2d 846, 849–52 (11th Cir.1989); *United States v. Miller*, 545 F.2d 1204, 1213–14 (9th Cir.1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977); *Davis v. United States*, 226 F.2d 331, 335–36 (6th Cir.1955), *cert. denied*, 350 U.S. 965, 76 S.Ct. 432, 100 L.Ed. 838 (1956). These cases have stressed the distinction between the nature of a civil collection action and a criminal tax proceeding:

> In civil tax cases the purpose is tax collection and the key issue is the establishment of the amount of tax owed by the taxpayer. In a criminal tax proceeding the concern is not over the type or the specific amount of tax which the defendant has evaded, but whether he has willfully attempted to evade the payment or assessment of tax.

> The difficulty in automatically applying the constructive distribution rules to this case is that it completely ignores one essential element of the crime charged: the willful intent to evade taxes, and concentrates solely on the nature of the funds diverted. That latter aspect is not the important element. Where the taxpayer has sought to con-

ceal income by filing a false return, he has violated the tax evasion statutes.

*Miller,* 545 F.2d at 1214; *see also Williams,* 875 F.2d at 850.

The Second Circuit recently has taken a view different from that expressed in *Williams, Miller* and *Davis. See United States v. D'Agostino,* 145 F.3d 69, 72–73 (2d Cir.1998). In *D'Agostino,* the taxpayers argued that they did not owe any tax on the diverted corporate funds because those funds were not constructive dividends. The taxpayers further asserted that the diverted funds could not be constructive dividends because the corporation had no earnings and profits in the years in question and therefore must constitute a reduction in the taxpayer's loan account or capital account with the corporation. Because there was no tax deficiency, there could be no violation. By contrast, the government argued, per *Williams,* that whether the diverted funds constitute personal income or corporate income depends on the intent of the taxpayer at the time the funds are diverted. If the intent is to evade taxes, the income is personal and taxable. If the intent is to take a reduction under the loan account or capital account, then the funds are not taxable. The Second Circuit took the view of the defendants and followed their precedent in civil cases that required the government to put on earnings and profits evidence in this type of case. *See id.* at 73.

■ *D'Agostino* and the other criminal cases we have just discussed involved alleged violations of 26 U.S.C. § 7201,[21] which requires the existence of a tax deficiency.[22] By contrast, § 7206(1)[23] requires only that the taxpayer file a return "which he does not believe to be true and correct as to every material matter." Indeed, this court has re-

cently held that the government need not prove an actual tax deficiency in order to convict a defendant under § 7206(1). *See United States v. Minneman,* 143 F.3d 274, 279 (7th Cir.1998); *accord United States v. Marashi,* 913 F.2d 724 (9th Cir.1990); *United States v. Wilson,* 887 F.2d 69 (5th Cir. 1989); *United States v. Miller,* 491 F.2d 638 (5th Cir.1974), *cert. denied,* 419 U.S. 970, 95 S.Ct. 236, 42 L.Ed.2d 186 (1974). Rather, the elements of a § 7206(1) violation are: (1) that the defendant made or caused to be made, a federal income tax return for the year in question which he verified to be true; (2) that *the tax return was false as to a material matter*; (3) that the defendant signed the return willfully and knowing it was false; and (4) that the return contained a written declaration that it was made under the penalty of perjury. *See United States v. Whyte,* 699 F.2d 375, 381 (7th Cir.1983). A false statement is "material" when it has "the potential for hindering the IRS's efforts to monitor and verify the tax liability" of the corporation and the taxpayer. *United States v. Greenberg,* 735 F.2d 29, 32 (2d Cir.1984). Here, the evidence showed that Dr. Peters diverted corporate funds directly to a personal account and that these funds were not accounted for in any way.

The focus of § 7206(1) is clearly on the taxpayer's intent. Here, there is no evidence in the record indicating that Dr. Peters intended the distributions at issue to be a return of capital. The record shows, however, a consistent pattern of diverting corporate funds into her personal accounts and making corporate expenditures for her personal benefit. Such a pattern is sufficient evidence to support the jury's conclusion that Dr. Peters filed tax returns which she did not "believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1). Ac-

---

**21.** That section provides:

§ 7201. Attempts to evade or defeat tax.

 Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,-000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

**22.** The taxpayer in *Miller* was charged with violations of both §§ 7201 and 7206(1). *See* 545 F.2d at 1212. Yet, the court's determination that the government need not put on evidence of earnings and profits in a criminal case applied to prosecutions under either statute. *See id.* at 1214.

**23.** *See supra* note 1.

cordingly, we hold that the government was not required to present evidence concerning the earnings and profits of Dr. Peters' corporation in order to convict her of a violation of § 7206(1).

## Conclusion

For the reasons stated in the foregoing opinion, we affirm the judgment of the district court.

AFFIRMED

EASTERBROOK, Circuit Judge, concurring.

Peters, who turned records over to the IRS in an audit, wants to prevent their use in this criminal prosecution because, she insists, the IRS had "firm indications of fraud" on her part before or during the audit. She advances two propositions. The first is that acquisition of evidence must cease once the IRS acquires enough information to refer the case to a criminal prosecutor. The second is that "firm indications of fraud" are inconsistent with a representation that the audit is "civil", rendering cooperation involuntary and the acquisition of documents a violation of the fourth amendment. (Peters also invokes the due process clause of the fifth amendment, but it is inapplicable to the seizure of evidence. *Sacramento v. Lewis*, —— U.S. ——, ——, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998); *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Cf. *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (no fifth amendment privilege in the contents of business records).) Although decisions can be found that accept both of these propositions, the first is antithetical to the fourth amendment and the second problematic.

Probable cause to believe that a crime has been committed is the constitutional requirement for a warrant; it is not an *objection* to a seizure. Why should a solid basis for believing that the suspect has committed a crime require the government to curtail its investigation? "Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." *Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Peters relies heavily on statements in IRS publications that instruct auditors to hand cases over to their criminal counterparts when evidence begins to build—this is where the phrase "firm indications of fraud" comes from—but *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), holds that the IRS's violation of its own rules or procedures for conducting investigations does not justify use of the exclusionary rule. See also *United States v. Mapp*, 561 F.2d 685 (7th Cir.1977). What is more—and dispositive— is *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), which holds that so far as the Constitution is concerned revenue agents may interrogate and gather evidence from taxpayers who the IRS believes have engaged in criminal wrongdoing.

Although the Constitution permits agents to keep gathering evidence long after they have "firm indications" of crime, Congress has blocked the use of one investigative tool. While "a Justice Department referral is in effect" it is not possible to enforce a summons for tax records. 26 U.S.C. § 7602(c)(1); *United States v. Michaud*, 907 F.2d 750 (7th Cir.1990) (en banc). This rule offers Peters no aid—first because the case was not "referred" to the Department of Justice until after the audit (see the definition of "referral" in § 7602(c)(2)), and second because a limitation on compulsory process does not imply a limitation on voluntary production. Agents are entitled to *ask*, however much (see *Beckwith*) or little (see *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)) evidence they possess. Taxpayers may find cooperation in their interests no matter how far along the road toward criminal prosecution the IRS has traveled; cooperation with auditors and prompt payment of civil penalties has staved off many a tax prosecution. So there is nothing to Peters' contention that "firm indications of fraud" oblige the IRS to stop

inquiring and require the suppression of evidence voluntarily disclosed.

Was disclosure voluntary? If a revenue agent uses deceit to get a taxpayer to turn over documents that could not have been secured either by a summons under 26 U.S.C. § 7602(b) or by a search warrant, it might make sense to suppress the results in order to ensure that the statutory line is honored. But what role would "firm indications of fraud" play in such an inquiry? The statutory question is whether the case has been referred for criminal prosecution, not whether the IRS has "firm indications of fraud". As for the constitutional standard: although the validity of consent obtained by *overstating* the weight of evidence in hand—making it look to the suspect like the jig is up, so there is no point in resisting—is questionable, why would *understating* the weight of existing evidence imperil voluntariness? A suspect who believes that the IRS lacks the evidence to commence a criminal prosecution, but who knows that records will furnish what the IRS needs, has powerful reasons to withhold consent. If despite this the suspect provides tax records, it is hard to see how the decision could be called involuntary. Law enforcement agencies are understandably reluctant to tell suspects what evidence they have gathered (indeed, they do not have to provide this information even after prosecution has begun). How can reticence about the weight of evidence the government possesses overbear a suspect's free will and prevent rational decision-making? That is the standard of voluntariness. *Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); *United States v. Rutledge*, 900 F.2d 1127, 1130–31 (7th Cir.1990). Peters knew that the IRS questioned the accuracy of information on her returns and that disclosure might either quell its doubts or reinforce them; she knew that she was entitled to withhold consent and force the IRS to use a summons, which she could resist in court; she had and used an opportunity to consult an accountant and could have consulted a lawyer as well. A person in Peters' position can make a rational choice among known risks and opportunities, and the election therefore properly may be called voluntary. *Schneckloth* holds that a consent to search may be voluntary even when the suspect is unaware that he is entitled to refuse; Peters' decision was much better informed than Bustamonte's (or Robinette's).

My colleagues opine that consent following an agent's misstatement about the weight of existing evidence is involuntary. Several of our cases say that a suspect in a tax case cannot have the evidence suppressed unless he shows, by clear and convincing evidence, that material misstatements of fact undercut the voluntariness of the consent to search. *United States v. Serlin*, 707 F.2d 953, 956 (7th Cir.1983); *United States v. Lehman*, 468 F.2d 93, 105 (7th Cir.1972); cf. *United States v. Stern*, 858 F.2d 1241, 1249 (7th Cir.1988). None of these holds, however, that agents' deceit *compels* a finding of involuntariness, for in each case the court held that the evidence was properly admitted. To hold that X, Y, and Z are *necessary* conditions of suppression is not to hold that they are *sufficient*. "[A]t least since *Schneckloth v. Bustamonte*, it cannot be said that ... deception [about the purpose of the investigation] is inherently incompatible with consent, for in *Schneckloth* the Court adopted the voluntariness test from the coerced confession cases, which has not been deemed to compel the exclusion of statements obtained by police misrepresentation of the crime under investigation." Wayne R. LaFave, 3 *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(n) at 710 (3d ed.1996) (footnotes omitted). A statement's voluntariness is not undercut by the fact that the speaker was unaware that he was a target (unaware, that is, that the prosecutor had "firm indications" of his criminal conduct). See *United States v. Washington*, 431 U.S. 181, 188–90, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977); *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); cf. *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977). If a misunderstanding of one's status as a target—misunderstanding abetted by calculated silence and half-truths from agents and prosecutors—does not invariably make a statement involuntary, why should it make a disclosure of physical evidence involuntary?

Police engage in deceit all the time in order to induce suspects to reveal evidence. Think of the undercover officer posing as a buyer of drugs. Much evidence is properly acquired by concealing a person's status as an agent of law enforcement. E.g., *On Lee v. United States*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); *Hoffa*, 385 U.S. at 300–03, 87 S.Ct. 408; *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); see also LaFave, *Search and Seizure* § 8.2(m). Deception plays an important and legitimate role in law enforcement. Even chicanery that creates the crime being prosecuted is constitutionally tolerable. See *United States v. Murphy*, 768 F.2d 1518, 1528–29 (7th Cir.1985). If dissimulation so successful that the suspect does not know that he is talking to an agent is compatible with voluntariness, how could there be a rule that misdirection by a known agent always spoils consent? Professor LaFave is rightly puzzled by courts' greater willingness to suppress evidence when agents who reveal their status give deceptive answers to inquiries about the purpose of the investigation than when agents lie about their status *as* agents.

One of these days the Supreme Court will confront the tension between these lines of cases. All that matters today, however, is that lack of candor about the purpose of an investigation is no more fatal to a consent search than it is to a confession—and that in either case the court of first instance must take all of the circumstances into account. Any attempt to separate "firm indications of fraud" from "first indications of fraud"—the distinction my colleagues suggest—is a snipe hunt, for reasons developed in *Hoffa* and reiterated in *Beckwith*. Because voluntariness of a consent is a question of "fact" whose resolution by the trier of fact is subject to deferential appellate review, our role is limited. *Robinette*, 117 S.Ct. at 421; *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. 2041; *United States v. Chi Fa Chan*, 136 F.3d 1158 (7th Cir.1998); *United States v. Sholola*, 124 F.3d 803, 819 n. 16 (7th Cir. 1997); *United States v. Shelby*, 121 F.3d 1118, 1120 (7th Cir.1997); *United States v.*

*Yusuff*, 96 F.3d 982, 986 (7th Cir.1996); *United States v. Stribling*, 94 F.3d 321, 323–24 (7th Cir.1996). The district judge found that Peters' consent was voluntary because the agents *did not deceive her*. That finding is not clearly erroneous. No more is necessary to resolve the appeal. If and when, in some future case, a judge concludes that agents prevaricated but that consent was nonetheless voluntary, our review should be equally deferential.